Luis H. Carrasquillo, demandante y recurrido, *v.* Lippitt & Simonpietri, Inc., Rafael Macías López, United States Casualty Co., demandados y recurrentes.

*Número:* R-66-295        *Resuelto:* 16 de febrero de 1970

*Emilio de Aldrey,* abogado de los recurrentes; *César J. Dones Magaz,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Con motivo del impacto en la parte trasera del vehículo del recurrido ocasionado por una guagua de la firma D. Serra & Cía. ocurrido en 7 de julio de 1959, reclamó aquél de la compañía aseguradora de dicha firma los daños ocasionados a su persona, y del ajustador recurrente Sr. Macías y de la recurrente Lippitt & Simonpietri por sus actos torticeros en detrimento de los derechos del recurrido.

El tribunal de instancia concluyó que (1) como consecuencia del accidente el recurrido sufrió contusiones y equimosis múltiples que afectaron principalmente el tórax, el hombro derecho y ambos brazos y en los músculos cervicales; estuvo bajo tratamiento durante un mes; (2) el vehículo del recurrido resultó en una pérdida total cuyo valor las partes fijaron en $1,200 y; (3) el 10 de julio de 1959 en el solar del Sr. Serrano, dueño de un taller de pintura y hojalatería a donde fue llevado el vehículo del recurrido, se reunieron éste último acompañado de su padre y los señores Macías, ajustador de pérdidas y el agente en Ponce de Lippitt; acordaron que dicho vehículo constituía una pérdida total; negociaron extensamente la cuantía a pagar por tal pérdida; luego de ingerir whiskey a insistencia de Macías quien le aseguró al recurrido que mezclar con alcohol las drogas que venía tomando no producía efecto nocivo, las partes transaron la reclamación por la pérdida de dicho vehículo en $1,200; a esos efectos el recurrido firmó un impreso de relevo de "cualquier y todas las acciones, causa de procesos, reclamaciones y demandas" que tuviera con motivo del accidente en cuestión; al aclarar el recurrido que sólo se estaba transiguiendo la pérdida del vehículo, Macías "le aseguró que en cuanto a los daños personales no habría problemas, que fuera a tomarse una radiografía y cuando le dieran de alta

pasara por la oficina en San Juan para llegar a un acuerdo;" (4) al recibir el cheque por los $1,200 con un comprobante que explicaba que dicha suma cubría $100 por las lesiones personales y $1,100 por la pérdida del vehículo, el recurrido telegrafió a Macías aclarando los términos de la transacción; éste contestó negando el contenido del telegrama y requiriendo la devolución del cheque si el recurrido no estaba de acuerdo; una vez dado de alta, el recurrido y su padre se entrevistaron con Macías en San Juan quien insistió en que el cheque reflejaba la transacción; (5) que Macías negoció de mala fe con el objeto de engañar a Carrasquillo, haciéndole representaciones falsas y fraudulentas, "amparando su conducta en la firma que había logrado en el documento de relevo y la impresión de que en actuación estaba libre y no daba lugar a una causa de acción—posición que asumió ante los tribunales y que fue rechazada en *Carrasquillo* v. *Tribunal Superior, Lippitt y Simonpietri, et al. Ints.*, 87 D.P.R. 661 (1963)"—; (6) los principales de Macías, Lippitt y Simonpietri, aprobaron y adoptaron la actuación mal intencionada y engañosa de éste; (7) "La conducta total de Macías, adoptada por Lippitt y Simonpietri, demuestra un esquema fraudulento y una actitud de repulsiva callosidad moral: un séquito de simpáticos colaboradores en un ambiente de hipócrita cordialidad; falsos halagos, explicaciones y promesas con el único propósito de conseguir la firma en el documento de relevo; un cambio de actitud y comportamiento inmediatamente después de conseguir la firma, hecho manifiesto en la posposición de la entrega del cheque y la copia del relevo, la preparación del cheque con la ridícula suma de $100.00 por los daños personales, la carta de Macías falseando los hechos y presionando su ventaja económica; la negativa a recibir a Carrasquillo; la insistencia en que había quedado legalmente inmunizado al lograr la firma en el relevo, y la contumacia y temeridad al afirmar su ventajería y falta de escrúpulos durante siete años."

En tal virtud, el tribunal de instancia dictó sentencia condenando (a) a la aseguradora a pagar al recurrido $3,700 por las lesiones a su persona y los sufrimientos físicos y mentales; (b) a Lippitt y Simonpietri y a Macías, solidaria y mancomunadamente, a pagar al recurrido $10,000 como compensación por haber sido víctima de su conducta dolosa, fraudulenta y torticera; y (c) a los recurrentes, solidaria y mancomunadamente, a la suma de $3,000 por concepto de honorarios de abogado más las costas.

No conforme, los recurrentes apuntan que el tribunal de instancia incidió:

(1) Al concluir que en la firma del relevo por el recurrido intervino fraude o dolo por parte de Macías López y al no concluir que en lo concerniente a las lesiones sufridas por el demandante pudo haber un mal entendido entre las partes sin que necesariamente mediara una conducta fraudulenta de parte de Macías.

(2) Al responsabilizar en $10,000 a Lippitt y Simonpietri por la conducta de Macías y a éste también, cuando el recurrido no probó daño alguno siendo dicha cuantía daños punitivos los que no proceden en nuestro derecho.

(3) Al conceder al recurrido cuantías excesivas de $3,700 por las lesiones que sufrió y de $3,000 en concepto de honorarios de abogado.

(4) Al hacer determinaciones de hecho contrario a la evidencia aducida y que al dictar sentencia el tribunal de instancia actuó movido por pasión, prejuicio y parcialidad.

■ 1.—Es doctrina repetidamente reiterada que el fraude no se presume nunca, o sea, que no puede tener base puramente conjetural. Para probar una simulación se requiere prueba que satisfaga la conciencia del juzgador. *Ledesma Marrero* v. *Ledesma Marrero*, 84 D.P.R. 167, 169 (1961); *Feliciano* v. *P. Cedeño S. en C.*, 78 D.P.R. 39, 43 (1955). En *Cruz* v. *Autoridad de Fuentes Fluviales*, 76 D.P.R. 312,

317–322 (1954), en relación con la muerte de una niña al ser arrollada por un camión, el ajustador de la aseguradora obtuvo el consentimiento de los padres a una carta de pago mediante la cual se obtuvo el relevo de toda la reclamación mediante el pago de $1,000.00. Les dijo que "venía a traerle mil dólares porque la compañía no pagaba más y aun si ella [la demandante] fuera a la corte no iba a conseguir más porque era una menor que se había perdido y no un jefe de familia." Revocamos el dictamen del tribunal de instancia en este caso porque concluimos que dicha carta de pago se obtuvo mediante dolo. Nos basamos en que se trataba de "un caso de responsabilidad admitida en el cual el ajustador de seguros a los 6 días de haberse causado la muerte de una niña de seis años de edad visita cerca de su casa a la madre que es prácticamente analfabeta y le dice que la corte no le concedería más de $1,000.00 porque la persona fallecida era una menor y no el jefe de la familia, y a los pocos minutos de haber consultado con su marido que era similarmente analfabeto, obtiene su firma en consideración del pago de $1,000 en una carta de pago que el ajustador había preparado antes de enterarse de los hechos del caso." Dijimos que "el ajustador, que había tenido dos años de experiencia en infinidades de casos, sabía que esta manifestación [que una corte no le hubiera concedido más de $1,000.00] era falsa de toda falsedad; que su intención era que la demandante confiara en su manifestación; y que la demandante—campesina ignorante, sencilla, que no podía sentirse completamente normal tan sólo seis días después de este fuerte accidente—confió en esta falsa y fraudulenta representación y fue por ello inducida a aceptar la oferta del ajustador y a firmar la carta de pago."

Veamos la prueba aducida en este caso, a la luz de lo expuesto, con el fin de determinar si sostiene las conclusiones del tribunal de instancia.

La prueba del recurrido consistió de su propio testimonio explicativo del accidente y del pago de los $1,200 y de evidencia documental consistente de un certificado del médico que lo examinó el cual fue admitido mediante estipulación, otro de la Administración de Programas Sociales del Departamento de Agricultura de Puerto Rico donde trabaja, concediéndole al recurrido 14 días de licencia por razones de salud comenzando en 8 de julio de 1959 hasta el día 24 de dicho mes, el relevo de responsabilidad firmado por el recurrido, el cheque que recibió y el telegrama que envió a Macías.

Testificó el recurrido que obtuvo la licencia de su trabajo "Porque al otro día que me golpeé, que me había dado el golpe, la noche anterior no me podía levantar. El golpe en el pecho era tan fuerte que, verdad, me dolía y el golpe aquí en el cuello y en el brazo y en el brazo derecho e izquierdo, aquí en el hombro y en todos lados, que me sentía tan adolorido, pues no me atrevía a levantarme y a la vez me sentía, no me sentía bien, me sentía mal, estaba machucado y el doctor me había dicho, ya que no me quise quedar la noche anterior, el doctor quería dejarme bajo observación . . ."; que Serrano lo llamó para que fuese a su garage tres días después del accidente pues venía el ajustador a ver el vehículo y "para ver a que acuerdo podíamos llegar"; que fue acompañado de su padre; que le ofrecieron mil dólares por el auto pero que él exigió $1,500.00; que fueron a la oficina de Serrano donde éste ". . . invitó a darnos unas bebidas y el señor Macías enseguida le sirvió bebida, un 'whisky' con hielo y agua, sirvió unos palos a cada uno, cogió su vaso cada uno, y yo le dije que yo no podía tomar porque estaba en tratamiento médico y hasta le enseñé unas pastillas . . ."; que como a la media hora el ajustador Macías le ofreció $1,200 por el automóvil "para dejar cerrado el accidente ese del carro"; que "El señor Macías se dirigió a mi papá y le dijo: 'Bueno, Luis, eso es lo más que yo puedo llegar y estoy tratando de dejar ese problema del carro resuelto hoy porque yo me voy

hoy mismo, tengo que irme hoy mismo . . .' ''; que al presentarle el documento de relevo lo leyó; que "Al yo ver esto, pues yo me alegré y entonces mi papá vino y lo vio y me dijo: 'Tú ves ahí está puesto, ahí lo dice, por el carro tuyo, por la colisión que tuvo tu carro', y entonces mi papá me dijo: 'Fírmalo', . . .''; que el recurrido dijo que ". . . 'aquí hay una cosa que no me gusta, que es que eximimos cualquier acción o causa de procesó y yo le dije: 'a qué se refiere esto?' y me dice: 'Eso es por el accidente del carro', y los mil doscientos pesos de que vienen?, se lo hice bien claro, y hay testigo, y yo le dije: 'Y cuando a mi me den de alta que todavía estoy bajo tratamiento, aunque me estoy dando palos', y me dijo: 'Cuando te den de alta ve allá, que eso lo arreglamos allá, firma esto por el carro', y yo se lo firmé''; que el día 15 de abril le avisó López Maldonado que pasara a recoger el cheque lo cual hizo; que ". . . lo que no me gustó fue cuando yo leí en el cheque una cláusula que dice aquí y un desglose que eso no fue lo que el señor Macías y yo habíamos quedado . . . . Ése que dice de 'property damages' y dice de 'bodily injury' y yo le dije al señor Macías que ése no era el compromiso y yo no iba a aceptarlo''; que recibió el cheque en la oficina del Sr. López Maldonado en Ponce; que telegrafió enseguida a Macías que "Solicito me conceda entrevista ya que transacción $1,200 se refería según conversación sólo a valor automóvil y no por lesiones que sufrí y aun bajo tratamiento. A base de eso firmé documento. Favor avisarme''; que Macías no aceptó el planteamiento hecho en el referido telegrama; y al tomar a préstamo $1,200 en el Banco de Ponce dejó el cheque en garantía con el fin de comprar otro automóvil; que a los diez u once meses de haber recibido el cheque cambió el mismo.

En contrainterrogatorio testificó el recurrido que tenía 34 años de edad; que desde el 1955 trabajaba en la Administración de Programas Sociales; que seguido del accidente fue al hospital pero no se hospitalizó sino que se fue a su casa y a los tres días concurrió al garage de Serrano a tratar con

Macías sobre su caso; que tomó licor a instancias "de ellos"; que "la insistencia fue tan grande que tuve que complacerlos." El contrainterrogatorio sobre este aspecto continuó así:

"P. Si usted se siente enfermo y yo le digo: 'tómese ese veneno', usted se lo toma?

R. No, no me lo tomo.

P. El hecho es que usted se sentía malo y se tomó todo eso y más de tres?

R. A insistencia del señor Macías: 'Pero, muchacho, esas pastillas no hacen nada, tómate un trago.'

P. Tuvo que complacerlo a él y usted blandito de corazón . . .

R. Ésa es una experiencia.

P. Y tu padre te dijo: 'no te tomes eso?'

R. 'Si te sientes malo no te tomes nada.'

P. El consejo que usted seguía era el del señor Macías. Vale más el consejo del señor Macías o el del padre?

R. El de mi padre.

P. No era esto que usted se sentía tan malo?

R. El señor Macías vino y vino mi papá y dijo: 'Deja ver las pastillas, date un palito y complácelo.'

P. Y cada vez que se terminara?

R. De momento me sentía sin dolor."

Testificó que firmó el relevo "Por el carro porque allí lo decía"; que el relevo en cuanto a sus lesiones "no las decía"; que Macías le señaló "Las lesiones vienen después." Preguntado si le indicó a Macías que aclarara lo de las lesiones en el documento, contestó "Y él no lo hizo. Dijo que después lo iba a cuestionar, después allá." Preguntado por qué no devolvió el cheque, contestó que "El señor López no lo quiso coger . . . después yo pensé; puedo hablarle; también yo había firmado la licencia de mi carro y ¿dónde estaba mi carro? Yo tenía que quedarme con el cheque . . ."; que no transigieron sus lesiones porque era sabido que estaba bajo tratamiento médico; que después que recibió la carta de Macías la cual leyó tampoco le devolvió el cheque. A pregunta de su abogado dijo que "Yo no podía devolver el cheque, verdad, porque yo necesitaba orientarme primero con cierta gente. Llamé a mi papá y mi

papá me dijo: 'Recuerda que él te dijo que esperaras que te dieran de alta y espera que yo tenga unos días libres que voy a ir a hablar con él, deja el caso ahí, que vamos a ir a hablar con él.' Y yo me quedé con el cheque." Preguntado si supo cuánto costó la reparación de su vehículo contestó "No, porque el carro lo vendí y se perdió."

Como testigo de los recurrentes testificó Rafael Serrano, el dueño del garage donde se celebró la reunión relativa a la transacción de la reclamación del recurrido. Testificó que estaban presentes Macías, a quien conocía "Como el gerente de reclamaciones de Simonpietri", Piñero y Rodríguez y el recurrido y su papá; que fueron a ver el automóvil accidentado propiedad del recurrido para determinar los daños que tenía, luego pasaron a su oficina donde "se llegó a una transacción . . . completa del caso por $1,200, incluía daños del carro"; testificó, además que es dueño de garage y perito en determinar los daños de vehículos y que el volumen de sus negocios con las casas de seguro alcanza un promedio al año de un cincuenta por ciento.

Rafael Macías López testificó que se encontró con el recurrido y su papá junto con Piñero y Rodríguez en el taller de Serrano; que "Estuve viendo el carro y empezamos la discusión de la transacción. Nos trasladamos a la oficina y allí se ultimó . . . una transacción por los daños personales del señor Carrasquillo . . . al firmar el relevo por $1,200 se incluían daños, igual que los daños personales"; que no quedó nada pendiente de transigir; que la explicación de por qué aparecía la suma desglosada en $100 por daños personales y $1,000 por daños al vehículo es que "De acuerdo con la reglamentación de la Compañía le tuvo que poner una cantidad"; que luego "Después que se hizo la transacción, nos obsequió el Sr. Serrano" con unos tragos. En contrainterrogatorio negó que el recurrido le dijese que estaba bajo tratamiento médico; que no fue a ver al médico del recurrido ni vio el certificado médico de éste durante la negociación de la transacción sino

que luego el recurrido le remetió no el certificado sino una cuenta que el testigo pagó en obsequio al recurrido; que el desglose de la cantidad del cheque es una cuestión interna de la oficina de la compañía. Al terminar de testificar este testigo los recurrentes anunciaron que los señores López Maldonado y Piñero declararían lo mismo que Macías. El recurrido entonces anunció que "en vista de la prueba no iba a presentar a su padre Luis Carrasquillo" porque "entendemos que no es necesario."

La carta de Macías al recurrido, en contestación a su telegrama que hemos hecho referencia previamente, lee que

"El telegrama de referencia me causó gran sorpresa, desde el punto de vista de su contenido. Sorpresa, porque yo había hecho muy claro que la transacción de los $1,200.00 era por el automóvil y posibles lesiones que pudo haber recibido. Precisamente por eso fue que cuando Ud. insistió en que le aumentáramos nuestra oferta, no me fue posible complacerlo. Además le dije que la transacción que hacía con Ud. representaba para la Compañía una pérdida de $200.00 a $300.00, de haber procedido a reparar el automóvil. No obstante yo preferí hacerlo así en beneficio de sus propios intereses y para que el buen amigo estuviera en condiciones de resolver su problema de transportación." y que

"Después de transigido el caso con Ud., debo recordarle que al calor de unos tragos entre buenos y distinguidos amigos, Ud. a tono de broma dijo que después de las primeras libaciones se sentía ya bien y que no tenía importancia. Que Ud. más bien había ido al médico por tener la seguridad de que no había sufrido ninguna lesión de importancia.

Si quiere retractarse de la transacción, así puede hacerlo y le rogamos la devolución del cheque."

La prueba demuestra que el recurrido no es un analfabeto ni un ignorante de quien se podía tomar ventaja indebida con relativa facilidad. El mismo admite que se dio cuenta de la naturaleza y extensión del relevo que firmó. Más tarde cuando protestó de la transacción mediante su telegrama, se le dio la oportunidad de dejar sin efecto la transacción me-

diante la devolución del cheque y no lo hizo. Por el contrario, utilizó el mismo y luego lo cobró. Estas circunstancias distinguen sustancialmente este caso del de *Cruz*, supra.

■ La prueba demuestra, sin embargo, que no hubo un entendido claro e indubitable sobre el alcance de la transacción realizada; que mientras el recurrido asumía que sólo cubría los daños del vehículo, Macías, de conformidad con la práctica conocidamente establecida por las aseguradoras de transar en un solo acto todos los daños incurridos, entendió que así lo había logrado al obtener la firma del recurrido en el impreso de relevo que su secretario Rodríguez llenó a maquinilla. Concluimos, por lo tanto, que no habiéndose logrado un entendido entre las partes con respecto a la naturaleza y alcance de la propuesta transacción, en derecho ésta no se realizó y por lo tanto no puede prevalecer.

En *Carrasquillo* v. *Tribunal Superior*, supra, no resolvimos, como parece indicar el tribunal de instancia, que la conducta de Macías daba lugar a una causa de acción. Sólo determinamos en este caso que la acumulación de determinadas partes en la demanda del recurrido era propia. Específicamente dijimos que "No debe entenderse, sin embargo, que estamos expresando juicio alguno sobre la suficiencia o los méritos de las distintas causas de acción alegadas en la demanda en este caso."

■ 2.—En el supuesto de que la conducta de Macías constituyese una actuación dolosa y fraudulenta al extremo de viciar el consentimiento del recurrido a la transacción realizada, el hecho es que el recurrido no ofreció prueba alguna de los daños que sufrió con motivo de tal actuación. *Masa* v. *A.F.F.*, 96 D.P.R. 856, 873 (1969). Por otra parte, la estimación de tales daños en $10,000 resulta tan excesiva que debe calificarse de carácter punitivo. En esta jurisdicción no procede conceder daños de esta naturaleza. *Pereira* v. *I.B.E.C.*, 95 D.P.R. 28, 55, Escolio 4 (1967); *Angelloz* v.

*Humble Oil & Refining Co.,* 199 So. 656, 659 (La. 1940).

Aunque en *Miguel* v. *Hernáiz Targa & Co.,* 51 D.P.R. 585, 591 (1937), se hizo referencia a daños punitivos, la realidad es que al conceder la suma de $500 como daños por el allanamiento de un hogar en virtud de una orden de allanamiento nula, este tribunal en derecho estimó la cuantía de los daños ocasionados que los recurridos debían resarcir. Sentencias de 7 de diciembre de 1919 y de 6 de diciembre de 1912 del Tribunal Supremo de España; Manresa, *Comentarios al Código Civil Español (6ta. ed.) tomo 12 págs. 652-653;* Scaevola, *Código Civil,* tomo 31, págs. 303, 316 y 321.

3.—Según el certificado del médico que lo atendió, las lesiones del recurrido consistieron de contusiones y equimosis múltiples en el tórax, hombro derecho y ambos brazos y daño en los músculos cervicales posteriores, de todo lo cual se quejó durante un mes por lo que se encontró incapacitado de trabajar. El tribunal de instancia estimó la cuantía de estos daños en $3,700.00.

■ La prueba demostró que al día siguiente al accidente el recurrido solicitó una licencia, no de un mes, sino de 14 días de su trabajo, por razones de salud. No tuvo que hospitalizarse ni guardar cama. A los tres días asistió y participó en la negociación que motiva este litigio y días después fue a recoger el cheque y a realizar las gestiones de compra de otro vehículo. Los daños, además de la impresión que el choque necesariamente causó al recurrido, en realidad fueron leves contusiones y cardenales en varias de las partes superiores del tronco y un golpe en los músculos del cuello, sin ulteriores consecuencias. Aunque estas lesiones pueden haber sido algo dolorosas y el dolor tardar días en desaparecer por completo, no incapacitaron al recurrido al extremo de obligarlo a hospitalizarse, recibir tratamiento especial, como por ejemplo diatermia y masajes o el suministro de algún calmante o recluirse en su casa. Por lo tanto, concluimos que la cuantía de daños es excesiva y debe reducirse a la suma de $1,000.00.

4.—En vista de que no se realizó la transacción que ha motivado la controversia en este caso, procede devolver el caso al tribunal de instancia para que previa vista y la presentación de la prueba que proceda, determina la extensión y cuantía de los daños ocasionados al vehículo del recurrido que la asegurada recurrente deberá pagarle.

5.—Una vez que la cuantía de los daños sufridos por el vehículo haya sido determinada por el tribunal de instancia, deberá deducirse la suma de $1,200 previamente pagada por los recurrentes al recurrido de la cuantía total de los daños a que se refieren los párrafos 3 y 4 anteriores.

6.—En vista de lo expuesto concluimos que la cuantía de honorarios de abogado es excesiva por lo que debe reducirse a la suma de $300.00.

*Se revocará la sentencia dictada en este caso en 31 de agosto de 1966 y en su lugar se dictará otra desestimando la demanda en contra de los recurrentes Macías y Lippitt y Simonpietri Inc. y condenando a la recurrida U.S. Casualty Co. a pagar al recurrido $1,000 por las lesiones personales que sufrió y los sufrimientos físicos y mentales derivados de éstos, más $300 por concepto de honorarios de abogado y las costas y se devolverá el caso al tribunal de instancia a los fines indicados en los párrafos 4 y 5 anteriores.*

El Señor Juez Presidente y los Jueces Asociados Señores Hernández Matos y Blanco Lugo no intervienen.