RAFAEL MATOS GÁMBARO, ETC., demandantes y recurridos, *v.* FLAMBOYÁN GARDENS, INC., demandada y recurrente.

Número: R-74-16    Resuelto: 15 de septiembre de 1977

O'Neill & Borges, Raúl E. González Díaz y A. J. Benazar Ze-
queira, abogados de la recurrente; Juan R. Bravo Bravo y
Juan A. Lugo Méndez, abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tri-
bunal.

El demandante Matos Gámbaro es un puertorriqueño edu-
cado hasta escuela superior en New York. Se fue del país a
la edad de 12 años y regresó 20 años después, empleándose
como *croupier* del Hotel Dorado Hilton. Dijo conocer mejor
el idioma inglés que el español (T.E. pág. 20).([1]) Firmó un

---

([1]) Dato comprobado por este incidente en el curso de su declaración
en el juicio:

"P. Debo entender que usted estudió su escuela primaria, secundaria
en Nueva York?

R. Sí, señor.

P. Y cuándo regresó a Puerto Rico?

R. En el '61.

P. En el 19 . . .

R. Sesentiuno, setentiuno . . .

P. Que conste que lo dijo en Inglés.

documento titulado "Contrato Uniforme de Opción" para comprar una casa de la recurrente Flamboyán Gardens por precio de $23,277.00 del que debía anticipar un pronto pago de $1,377.00 y al que sólo abonó $200 al firmar y $300 más tarde para un total de $500.00. Construida la casa y citado el comprador tres veces por telegrama para que acudiera a firmar escrituras y completar el balance de pronto pago, en todas las ocasiones se dirigió a inspeccionar la obra antes de ir al Notario y encontró defectos menores de construcción, que la vendedora recurrida corrigió en parte pero no al punto de satisfacer al comprador. Finalmente el 18 de mayo de 1971 Flamboyán Gardens le escribió informándole que había procedido "a cancelar su contrato de compraventa." Ese mismo día la constructora vendió la casa separada por el demandante a un tercero llamado Normando Rodríguez Ojeda por $23,777.00, quinientos dólares más que el precio acordado con el recurrido. Este recibió la carta el 19 de mayo de 1971 y al día siguiente se personó en las oficinas de Flamboyán Gardens donde fue atendido por el presidente de la corporación y en cuya ocasión firmó la siguiente carta:

---

Hon. Juez:
Aquí tiene que hablar Español, no estamos en Nueva York.
R. Cuando llego a los sesentiuno o setentiuno ahí yo me confundo, así que perdone.
P. Yo no tengo nada contra del Inglés, pero no se puede hablar Inglés aquí." (T.E. pág. 21.)

"Date  May 20, 1971

Flamboyan Gardens, Inc.
Box 1998
Bayamón, Puerto Rico 00619

RE:  Block 00    Lot 1 P
Alturas de Flamboyan
Bayamón, P.R.

Gentlemen:

I hereby cancell [*sic*] purchase of Lot 1 P Block 00 Alturas de Flamboyan and release any claim whatsoever on said Lot. I request my downpayment [*sic*] be returned to me in accordance with my contract.

[(Fdo.)]    Rafael Matos Gámbaro
_____

(signature)
_____

(signature)

Approved by: ———————————
As per Mr. Perle's instruction do not hold money."
  "$500.00                              OK refund"

Poco después de firmar este documento, la recurrente le envió por correo el reembolso de $500. El recurrido demandó reclamando daños y perjuicios por los siguientes conceptos: que dejó de ganar $3,000 de aumento (en valor de la casa); que tendrá pérdida de $1,000 equivalente al alquiler de casa que ha de pagar por no menos de 1-1/2 años que le tomará adquirir otra casa propia; más $10,000 que para la familia representa verse privada por 1 año de las "ventajas y comodidades que un hogar propio ofrece." El pleito sobrevivió una moción de sentencia sobre las alegaciones, y visto en sus méritos recayó sentencia concediendo al demandante indemnización de $5,023.00 que representa la diferencia entre el

precio de venta acordado en el contrato y el valor en el mercado de dicha propiedad un año después, término que el juez de instancia estimó "razonable para la construcción de una casa similar." Se condenó, además, a Flamboyán Gardens al pago de $850 de honorarios de abogado, las costas e intereses "a partir de la radicación de la demanda."

De los seis errores señalados por la recurrente nos detendremos en el primero y el cuarto que, a nuestro juicio, fueron cometidos, y que se exponen así:

I—"Erró el Honorable Tribunal sentenciador al determinar que la Demandada-recurrente canceló el contrato de compraventa unilateral e injustificadamente y al apreciar la evidencia sobre este extremo.

.    .    .    .    .    .    .    .

IV—Erró el Tribunal sentenciador al no resolver que el documento de relevo firmado por el co-demandante recurrido Rafael Matos Gámbaro, el día 20 de mayo de 1971, constituye un relevo válido y eficaz en derecho; que en virtud del mismo los demandantes-recurridos efectivamente renunciaron a cualquier reclamación que tuviesen contra la demandada recurrida [sic] con motivo de la cancelación del contrato de compraventa; y al apreciar la prueba al respecto."

Aun en el supuesto de que la constructora fallara en complacer el criterio final del comprador respecto a la corrección de lo que él señalaba como vicios de construcción no está libre de culpa el recurrido toda vez que no satisfizo el pronto pago de $1,377.00 por lo que su reclamación está excluida por disposición de los Arts. 1389 y 1077 del Código Civil.(²) El

---

(²) Art. 1389 (31 L.P.R.A. sec. 3871)

"El comprador está obligado a pagar el precio de la cosa vendida en el tiempo y lugar fijados por el contrato.

"Si no se hubieren fijado, deberá hacerse el pago en el tiempo y lugar en que se haga la entrega de la cosa vendida."

Art. 1077 (31 L.P.R.A. sec. 3052)

"La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe."

requisito de cumplimiento por parte del comprador es de especial exigencia, considerando que por haber rehusado comprar la casa y no habiendo vivido en ella, no pudo ejercitar la acción decenal reservada por el Art. 1483. (³)

Mas la actuación que definitivamente enerva la reclamación de "lucro cesante" del comprador fue la firma por éste de la sencilla y clarísima carta de relevo redactada en su idioma de adopción. Durante el juicio que tuvo lugar los días 14 y 15 de noviembre de 1973 el demandante repudió el relevo declarando que lo firmó "con coraje" y que no lo leyó creyendo que se trataba de un recibo por los $500 de pronto pago parcial que le devolvía la constructora, y que si lo hubiera leído, no lo firma. (⁴) Lo que él dice que confundió con

---

"[L]a tendencia natural a proteger el interés de todo contratante a base de condicionar cada acto de cumplimiento con el que incumbe a la otra parte, se abrió paso con bastante rapidez. En la época clásica ya se había impuesto la llamada 'exceptio non adimpleti contractus', con una eficacia parecida al derecho a denegar la propia prestación." Puig Brutau, *Fundamentos de Derecho Civil*, Tomo II, Vol. 1, págs. 157–158 (Ed. 1954).

(³) Art. 1483 (31 L.P.R.A. sec. 4124)

"El contratista de un edificio que se arruinase por vicios de la construcción, responde de los daños y perjuicios si la ruina tuviere lugar dentro de diez años, contados desde que concluyó la construcción; igual responsabilidad, y por el mismo tiempo, tendrá el arquitecto que la dirigiere, si se debe la ruina a vicios del suelo o de la dirección.

"Si la causa fuere la falta del contratista a las condiciones del contrato, la acción de indemnización durará quince años."

(⁴) "P. La pregunta es si usted le preguntó al señor Perle sobre la naturaleza, sobre el contenido de ese documento?

R. No, porque fue todo tan rápido que ellos estaban insistiendo que firmara eso porque ellos querían salir de eso y fue una cosa rápido [*sic*].

'Toma firma ahí', y nada más.

P. Usted no pidió explicación?

R. Es que cuando uno tiene coraje la mente se le va y cuando uno quiere reaccionar . . .

P. Usted firmó algún documento?

R. Sí, para coger mis chavos porque estaba cansado.

P. Usted firmó para coger sus chavos?

R. Yo quería mis chavos.

P. Usted firmó sin leer?

R. Ellos me daban un recibo de quinientos pesos.

P. Eso del recibo usted cree que era un recibo o se lo dijeron?

un recibo empieza con la cortante expresión: "I hereby can-cell [*sic*] purchase . . . ." Tiene mucho más peso y valor proba-torio la declaración jurada prestada por el propio demandante el 20 de enero de 1972 ([5]) donde dice: ". . . yo leí el recibo, que era una carta en inglés, le pedí que me explicaran qué enten-dían ellos por lo que la carta decía. El Sr. Perle me explicó que la carta era una constancia de que me entregaban el dinero y que ya yo no podía comprar esa casa." No están pre-sentes aquí las circunstancias de invalidez, ignorancia e im-previsión que dieron lugar a nuestra doctrina sobre relevos en *Cruz* v. *Autoridad de Fuentes Fluviales*, 76 D.P.R. 312 (1954) y *Carrasquillo* v. *Lippitt & Simonpietri, Inc.*, 98 D.P.R. 659 (1970). La agilidad mental de un *croupier* como lo es el demandante y su dominio del idioma inglés inclinan toda la fuerza de credibilidad hacia la conclusión de que él firmó la carta de relevo con plena conciencia de sus actos, después de leerla, de entenderla, y hasta de confrontar su

---

R. Para mí yo creía que era un recibo.

P. Debo creer que el señor Perle no le explicó nada con relación al propósito de ese documento, al contenido de ese documento, nada sobre eso?

R. Sí, señor.

P. Eso que usted llama recibo estaba en inglés o español?

R. Inglés.

P. Cómo usted sabe que estaba en inglés si no lo leyó?

R. Porque después yo recibí la copia, cuando llegué a casa leí la 'de'so' yo me quedé con la copia y al llegar a casa la leí y entonces vi lo que había escrito y fue que . . .

P. Fue qué?

R. Entendí lo que era.

P. Entonces lo entendió?

R. No en el tiempo ese.

P. Si lo hubiese leído en el día que le fue entregado . . .

R. No lo hubiese firmado.

P. Porque entendía lo que decía?

R. Sí, señor; pero en el tiempo que me dieron el papel no entendía." T.E. págs. 62–63.

([5]) La carta de relevo se firmó el 20 de mayo de 1971, por lo que esta declaración jurada está en tiempo de recoger con mayor fidelidad el re-cuerdo de lo ocurrido que el testimonio prestado en juicio, cerca de dos años después del incidente.

criterio respecto a sus consecuencias con el Presidente de la recurrente en cuya oficina se preparó dicho documento en presencia del propio demandante. Es éste uno de los raros casos de apreciación tan alejada de la realidad fáctica, que nos obliga a intervenir con las conclusiones del juzgador de hechos.

■ El demandante optó por no comprar la casa al no satisfacerle la que según la constructora estaba "lista para entrega"; y recuperó los $500 que representan su única inversión en el negocio. Sus molestias e inconvenientes, así calificados por el juez de instancia, no alcanzan la dimensión de sufrimiento moral y pérdida económica que en *Géigel* v. *Mariani*, 85 D.P.R. 46 (1962), *Pereira* v. *I.B.E.C.*, 95 D.P.R. 28 (1967), y su progenie justificaron la sanción civil de una condena en daños. No estamos convencidos de que en este caso deba inaugurarse una nueva doctrina extendiendo al que no compra la protección debida al que adquiere la casa, se instala en ella y sufre no simples molestias, sino la pérdida y la angustia que generan aquellos vicios de construcción que exceden la medida de imperfección, aliada perenne de la obra del hombre. *Pereira,* supra.

Con dichos antecedentes y fundamentos, la sentencia dictada el 11 de diciembre de 1973 por el Tribunal Superior (Bayamón) *será revocada.*

El Juez Presidente Señor Trías Monge se inhibió. El Juez Asociado Señor Rigau no intervino.