ENIO MIRANDA SOTO, demandante y recurrido, *v.* ESTEBAN
MENA ERÓ y ÁNGELA MENA, demandados y recurrentes.

*Número:* R-77-287 *Resuelto:* 11 de marzo de 1980

*Jesús E. Palmer, Augusto Palmer, Angel Manuel Ciordia y Rafael Arzuaga Casillas,* abogados de los recurrentes; *Leopoldo C. Delucca,* abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

El Sr. Enio Miranda recibió $8,000.00 por gestiones de corretaje en la venta de unos terrenos de los esposos Esteban y Ángela Mena. En pleito seguido ante el tribunal de instancia obtuvo sentencia que declaró que su consentimiento al aceptar dicho pago estuvo viciado por maquinaciones insidiosas de parte de los esposos Mena. Se condenó en dicha sentencia a los referidos esposos, aquí recurrentes, a pagar a Miranda $64,500.00 en virtud de un contrato de corretaje que habían suscrito las partes en 1965. Se plantea ante nos si fue válido el consentimiento dado por Miranda al aceptar los $8,000.00. Independientemente de este planteamiento, hay aquí un caso de novación extintiva evidenciado por la clara intención de las partes, según reflejan los testimonios. El contrato de corretaje original de 1965 fue sustituido por otro de 1ro. de abril de 1970.

A continuación exponemos los hechos en detalle. Para el año 1965 la sociedad de gananciales constituida por los esposos Esteban y Ángela Mena era dueña de dos fincas radicadas en la playa de Mar Chiquita en Manatí. Ambas sumaban unas cincuenta y cinco cuerdas.

El 21 de octubre de ese año los esposos Mena y el señor Enio Miranda, corredor de bienes raíces, suscribieron ante notario un contrato que, en lo aquí pertinente dispone:

"Por la presente autorizamos al Sr. Enio Miranda a llevar a cabo

las gestiones de venta para el terreno de nuestra propiedad en la playa de Mar Chiquita, Manatí, Puerto Rico.

El Sr. Miranda recibirá como compensación por sus gestiones el cinco (5%)[sic] de la venta de la propiedad si se vendiere en $3,000 la cuerda.

Si el precio de venta exediera [sic] la cantidad de $3,000 la cuerda el Sr. Miranda recibirá la mitad (50%) de la cantidad que exediera [sic] la venta a base de $3,000 la cuerda.

.    .    .    .    .    .    .    ."

Como resultado de gestiones del Sr. Miranda, el 10 de febrero de 1966 se firmó un contrato de opción de compra que culminó el 28 de julio de 1966 en el otorgamiento de una escritura de compraventa entre los esposos Mena y Villas de Mar Chiquita, Inc., corporación doméstica que se propuso urbanizar los terrenos y construir en ellos casas para la venta. El precio estipulado fue $250,000.00 a cuya suma se acreditaron $20,000.00 pagados al firmarse la opción, la compradora retuvo $40,000.00 para saldar dos hipotecas de $20,000.00 cada una que gravaban una de las fincas, y el balance de $190,000.00 se pagaría con parte del producto de la venta de las casas a construirse, para lo cual se fijó un plazo de cuatro años. Más tarde surgieron problemas en cuanto al pago de las hipotecas y al permiso de Planificación para el proyecto, lo que motivó que los esposos Mena demandaran judicialmente la resolución del contrato de compraventa y daños y perjuicios ante el Tribunal Superior, Sala de San Juan.

Mientras tanto, el Sr. Miranda no había cobrado su comisión y acordó con los esposos Mena, el 1 de abril de 1970, el siguiente contrato que redujeron a escrito y suscribieron:

"NOSOTROS, suscribientes esposos ESTEBAN MENA ERO y ANGELA NIEVES JIMENEZ, por la presente convenimos con el suscribiente ENIO MIRANDA remunerar su labor del corretaje de nuestras fincas de Mar Chiquita, Manatí, con Francisco Levy Cumpiano—por razón del pleito 69-2376 de la Sala de San Juan del Tribunal Superior, surgido de este negocio—en la siguiente forma: una vez se resuelva final y firmemente dicho caso y se nos devuelva las fincas estaremos obligados a pagarle OCHO MIL ($8,000.00) DOLARES; si además de sernos devueltas las fincas se condena a

Francisco Levy Cumpiano a pagarnos la totalidad o parte de los daños que le reclamamos, estaremos obligados a pagarle una suma no menor de QUINCE MIL ($15,000.00) DOLARES, siendo la suma mayor a ésta discrecional de nosotros.

EN TESTIMONIO DE LO CUAL firmamos este documento en presencia del Lcdo. ANGEL MANUEL CIORDIA, quien guardará la única copia que se hará del mismo hasta que surja la obligación de cumplir; también lo firma Enio Miranda en aceptación de lo dispuesto en el mismo.

En San Juan, Puerto Rico, a 1 de abril de 1970." (¹)

Transcurrió cerca de un año. En el ínterin, el Tribunal Superior desestimó la demanda de los esposos Mena contra Villas de Mar Chiquita, Inc., recurriendo dichos esposos ante nos en solicitud de revisión. El Sr. Miranda había expresado en repetidas ocasiones su necesidad de dinero. El 18 de junio de 1971, el Sr. Mena le entregó $8,000.00 mediante cheques oficiales del Banco Crédito y Ahorro Ponceño, y en esa misma fecha Miranda suscribió el siguiente documento:

## "CARTA DE PAGO Y SALDO

Yo, ENIO MIRANDA, por la presente hago constar que he recibido de manos del Sr. Esteban Mena Eró un cheque por la suma de $8,000.00, en pago de todos mis trabajos, labores y gastos en el corretaje que le hice de su finca en la playa Mar Chiquita dándole por ésta la más eficiente carta de pago total.

En Santurce, Puerto Rico, a 18 de junio de 1971."

El 23 de noviembre de 1971 Miranda instó demanda contra los esposos Mena en reclamación de la suma de $64,500.00 que alegó serle adeudada por éstos en virtud del contrato de corretaje suscrito el 21 de octubre de 1965. Alegó que la finca se vendió en $310,000.00. No mencionó en su demanda el contrato de 1 de abril de 1970 ni la carta de pago de 18 de junio de 1971. El tribunal de instancia determinó, luego de un juicio en los méritos del caso, que los demandados esposos Mena habían transigido el pleito que llevaban contra

---

(¹) Francisco Levy, a quien se alude en los autos como una persona millonaria, fue la persona traída por Miranda como comprador de las fincas. La venta se hizo luego a favor de Villas de Mar Chiquita, Inc., de la cual Levy era presidente y accionista.

Villas de Mar Chiquita, Inc., cuando efectuaron el pago de $8,000.00 a Miranda, de cuyo hecho no dieron conocimiento a éste y por el contrario le manifestaron que dicho caso estaba aún pendiente. Concluyó como cuestión de derecho, sin más elaboración, que el acuerdo del 1 de abril de 1970 no dejó sin efecto el contrato de corretaje suscrito en 1965; que Mena, "mediante maquinaciones insidiosas, y a sabiendas de que el pleito civil había terminado y que al demandante correspondía la suma acordada en el contrato de corretaje llevó al demandante a aceptar la suma de $8,000.00 y a firmar una carta de saldo"; y dictó sentencia en que condenó a los esposos Mena a satisfacer al demandante Miranda la suma de $64,500.00, intereses, costas, y $4,000.00 para honorarios de abogado. Inconformes, los esposos Mena instaron ante nos recurso de revisión. Ordenamos la transcripción de la prueba testifical y expedimos el auto. Las partes han presentado sus respectivos alegatos, quedando el caso sometido a nuestra consideración.

La controversia ante nos ha sido centrada por las partes en si el consentimiento dado por Miranda al aceptar los $8,000.00 en "pago y saldo" de sus gestiones de corretaje estuvo viciado por dolo. La conclusión del tribunal de instancia en ese sentido, aunque halla algún apoyo en la prueba, no es convincente. Pasa por alto que el Sr. Miranda no estaba ajeno al pleito entre los esposos Mena y Villas de Mar Chiquita, Inc., en que él, Miranda, era testigo esencial. Y pasa por alto que Miranda no es una persona ignorante, de poca preparación, dúctil y de fácil manejo. Es, por el contrario, un corredor de bienes raíces, que se presume experimentado en los negocios y que se desenvolvía entre abogados e inversionistas de gran solvencia económica, según se desprende de la transcripción de su testimonio y el del Lcdo. Carlos E. Látimer. Fue el Sr. Miranda quien indujo a los esposos Mena a otorgar el contrato de corretaje de octubre de 1965, redactado por él y suscrito ante notario de su selección, hecho expuesto en la petición y no negado en su oposición al recurso. El Sr. Miranda era, además, Oficial de Intercambio Internacional en el Estado

Libre Asociado, según expresó en su declaración. La preparación académica, condición social y económica, y relaciones y tipo de negocios en que se ocupa una persona son factores de particular significación al determinar la existencia de dolo que anule su consentimiento. Compárese *Carrasquillo* v. *Lippitt & Simonpietri, Inc.*, 98 D.P.R. 659, 668 (1970); *Cruz* v. *Liverpool & London Ins. Co.*, 79 D.P.R. 722 (1956); y *Cruz* v. *Autoridad de Fuentes Fluviales*, 76 D.P.R. 312 (1954). Además, el dolo, como el fraude, no se presume, y para establecerlo se requiere prueba que satisfaga la conciencia del juzgador. Véanse *Carrasquillo v. Lippitt & Simonpietri, Inc.*, supra, pág. 662, y casos allí citados.

Pero, independientemente del aspecto del supuesto vicio del consentimiento al aceptar los $8,000.00 en pago de sus servicios de corretaje, se plantea aquí si el contrato de 1 de abril de 1970 tuvo el efecto de producir una novación extintiva de la obligación contraída por los esposos Mena en el documento de 21 de octubre de 1965. Si se produjo la novación— y así lo entendemos—carece de importancia si hubo o no dolo en la transacción del 18 de junio de 1971.

El Art. 1110 del Código Civil, 31 L.P.R.A. sec. 3151, establece que la novación es causa de extinción de las obligaciones. No obstante, como señalamos en *Warner Lambert Co.* v. *Tribunal Superior*, 101 D.P.R. 378, 389 y ss. (1973), y reafirmamos en *G. & J., Inc.* v. *Doré Rice Mill, Inc.*, 108 D.P.R. 89 (1978), la novación no es siempre extintiva. Puede ser meramente modificativa de una obligación anterior que queda subsistente. En este sentido, nuestro Código Civil se aparta del Derecho romano en que "el formalismo de la contratación exigía que la más leve variación en los términos de una relación obligatoria se tradujera en la extinción de la obligación primitiva y en la creación en su lugar de otra relación nueva". Puig Brutau, *Fundamentos de Derecho Civil*, (ed. 1976), T. I, Vol. II, pág. 457. Más adelante continúa diciendo Puig Brutau, pág. 458:

"En Derecho moderno las reglas de la novación son compatibles,

en principio, con la voluntad de los sujetos de derecho para obligarse, liberarse o alterar sus relaciones jurídicas de la manera que estimen conveniente, sin más límites que los resultantes del art. 1.255 del Código Civil. Las partes pueden extinguir una obligación sustituyéndola completamente por otra o pueden limitarse a modificarla. La novación puede ser extintiva o modificativa de la obligación que se considere. Con acierto observa DÍEZ–PICAZO que la discusión de si una obligación sólo se ha modificado o si, con la variación, ha cambiado tan esencialmente que se trata de otra obligación, no es una discusión escolástica, sino que, con ello, 'lo que en rigor se está discutiendo es el régimen jurídico que, a partir de la modificación, le es aplicable. Dicho más claramente: la permanencia o no permanencia de la relación, es, en rigor, la pervivencia o no pervivencia del régimen jurídico anterior'." (El Art. 1.255 citado, del Código Civil español, es equivalente al 1207 del nuestro, 31 L.P.R.A. sec. 3372.)

El Art. 1158 del Código Civil, 31 L.P.R.A. sec. 3242, exige que "[para] que una obligación quede extinguida por otra que la substituya, es preciso que así se declare terminantemente, o que la antigua y la nueva sean de todo punto incompatibles". De aquí resulta que la novación extintiva puede producirse porque así lo hayan expresado las partes, o porque de la prueba surja claramente su voluntad de extinguir la anterior obligación por otra nueva incompatible con la primera. A esta segunda hipótesis se refiere el profesor Vázquez Bote, *Derecho civil de Puerto Rico*, (ed. 1973), T. III, Vol. 1, pág. 380, como novación *tácita*. Díez-Picazo y Guillón, *Sistema de Derecho civil*, (ed. 1976), Vol. II, pág. 195, señalan que en rigor, "la incompatibilidad existe cuando la obligación anterior y la posterior al acto novativo pertenecen a tipos distintos o se han transformado de naturaleza". Empero, apuntan que la jurisprudencia "afirma reiteradamente que la incompatibilidad existe cuando hay alteraciones esenciales en la obligación, es decir, variación de 'las condiciones principales' de las que habla el Art. 1203 [1157 nuestro, 31 L.P.R.A. sec. 3241] como el objeto o el precio en el contrato. No hay novación, en cambio, cuando subsistiendo la obligación primitiva se dan facilidades para su cumplimiento, *v. g.*,

prórroga o plazos fraccionados. No obstante, *cuando el plazo constituye condición esencial del contrato, su alteración es causa de novación extintiva por incompatibilidad entre la nueva y la primitiva obligación.* En definitiva, el criterio jurisprudencial es el que juzga acerca de si han variado 'las condiciones principales', en suma, se deja a la apreciación de cada caso si una variación afecta a una condición que ha de ser tenida por principal". (Entre corchetes suplido; bastardillas nuestras.)

Aplicando estos criterios, veamos cuál fue la intención de las partes según se desprende de la prueba en el caso ante nos. *G. & J., Inc.,* supra; *Warner Lambert Co.,* supra, pág. 389; *Hernández* v. *Burgos,* 40 D.P.R. 460, 463 (1930).

La obligación contraída por los esposos Mena el 21 de octubre de 1965 era la de pagar a Miranda determinado por ciento (cinco por ciento) del precio de venta de las fincas más cincuenta por ciento de lo que ese precio de venta excediera de $3,000.00 la cuerda. Mediante el contrato de 1 de abril de 1970 se cambió la obligación de los esposos Mena por otra: pagar $8,000.00 a Miranda si se resolvía la venta. En ambas obligaciones la causa para los esposos Mena era la misma: compensar a Miranda por sus servicios de corretaje. Pero se estableció para ello un nuevo plazo, indeterminado, a saber, cuando se resolviera a favor de los esposos Mena, "final y firmemente" el caso pendiente contra Villas de Mar Chiquita, Inc. Además, conforme al primer contrato, la compensación a pagarse dependía de que se lograra la venta. En el segundo la compensación dependía de que se devolvieran las fincas a los esposos Mena, es decir, de que no hubiera venta. Las dos obligaciones eran incompatibles y no podían por tanto coexistir.

El Sr. Miranda fue explícito en cuanto a su entendido de que el segundo contrato sustituía al primero y no era una mera modificación de éste. Interrogado por su abogado por qué aceptó ese segundo acuerdo, dijo: "Yo no hubiera tenido derecho a comisión conforme a un documento anterior."

(T.E., pág. 24.) Se refería al contrato de 1965. Así también lo entendió su abogado Lcdo. Luis A. Lugo cuando argumentaba ante el tribunal de instancia sobre una moción de desestimación formulada por los demandados aquí recurrentes al concluir la prueba de Miranda. Refiriéndose al segundo contrato, dijo: "Las partes contemplaban cuando firmaban este documento que la finca revirtiera al demandado y que no iba a haber venta. Y lo dijo el propio demandante; que esa fue la única razón por la cual él firmó eso."

Sobre este aspecto el Lcdo. Ángel Manuel Ciordia, que fue quien redactó el contrato de 1 de abril de 1970, corroboró a Miranda al testificar: "Siendo estas las pretensiones del señor Mena [resolver el contrato de compraventa] en su caso surgió el problema de que el contrato que tenía el señor Miranda con él, pues, quedaba en el aire una vez Mena recibiese la propiedad. O sea, Miranda iba a perder su labor porque no se iba a consumar la venta. No se iba a consumar ese negocio. Al haber una sentencia que favoreciera al señor Mena. Hablamos con el señor Miranda quien a la vez se necesitaba como testigo en el otro caso—en el caso de Esteban Mena contra Villas de Mar Chiquita.—Y lo fuimos a ver con el propósito de que él nos sirviera de testigo en el caso, dando todo el conocimiento que él tenía de la relaciones y conversaciones entre Mena y Cumpiano, quien fue demandado personalmente y como accionista y dentro de la corporación. En las conversaciones él se enteró de que él vio la posibilidad de si prosperaba la acción de Mena iba a quedar sin ninguna ganancia *y en la conversación que tuvimos con él se convino en destruir el contrato aquél original que había firmado en septiembre del '65 por otro que se firmó otro día entre Mena, su esposa, el señor Miranda y yo como testigo, el día 1ro de abril de 1970...".* (T.E., págs. 44–45.) (Énfasis nuestro.)

Este testimonio no fue contradicho por Miranda, lo cual pudo hacer en su turno de refutación si consideraba que no se convino, como declaró Ciordia, en destruir el contrato de 1965 y sustituirlo por el de 1970. Hemos expresado reiterada-

mente que "la declaración de un testigo no contradicho sobre un hecho determinado, debe merecer crédito, a no ser que su versión sea físicamente imposible, inverosímil o que por su conducta en la silla testifical se haga indigno de crédito". *Caballero* v. *González,* 53 D.P.R. 539 (1938); *Navarro* v. *Compañía Azucarera "El Ejemplo",* 53 D.P.R. 726, 735 (1938); *Planellas* v. *Sucn. Planellas,* 59 D.P.R. 372, 390 (1941); *Pedraza* v. *González,* 66 D.P.R. 757, 761 (1946); *Cintrón* v. *Cintrón,* 70 D.P.R. 770, 784 (1950); *Biaggi* v. *Sucn. Esbrí,* 71 D.P.R. 450, 457 (1950); *Villaronga, Com.* v. *Tribl. de Distrito,* 74 D.P.R. 331, 345 (1953); *Alicea* v. *Sucn. F. Gil Rivera,* 87 D.P.R. 789, 790 (1963).

Como puede colegirse de todo lo anteriormente expuesto, para el 1ro de abril de 1970 los esposos Mena habían vendido las fincas a Villas de Mar Chiquita, Inc., por $250,000.00, de lo cual correspondía una comisión al Sr. Miranda por sus gestiones de corretaje. Pero para esa fecha no se había cobrado el precio de la venta, la cual estaba en litigio. Si el pleito era ganado por Villas de Mar Chiquita, Inc., Miranda cobraba conforme el contrato de corretaje de 21 de octubre de 1965. Pero eso era incierto. Y Miranda concibió la probabilidad de que el contrato de compraventa se resolviera y no habiendo venta, nada tendría derecho a cobrar. Ante esa perspectiva Miranda optó por cambiar el contrato por otro. Cobraría si se resolvía el contrato. La novación extintiva es evidente, y erró por tanto el tribunal de instancia al condenar a los esposos Mena a pagar a base del contrato de corretaje de 21 de octubre de 1965. Su obligación bajo dicho contrato fue extinguida por novación mediante el contrato de 1 de abril de 1970. Siendo así, carece de importancia ahondar en la validez de la aceptación por Miranda de los $8,000.00 que en junio de 1971 le fueron pagados.

*Se dictará sentencia en que se revoque la aquí recurrida.*

Los Jueces Asociados Señores Torres Rigual y Negrón García no intervinieron.