Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| | | |
|---|---|---|
| MARRATHIMA TRIGUEIRO ROCHA POR SÍ Y COMO REPR TESTAMENTARIA, ALBACEA Y VIUDA DE DON MARCELO E. VILLENA LANZI, ENRIQUE C VILLENA DRAPER, ALFONSO VILLENA FEBRES Y OTROS<br><br>Demandante - Recurridos<br><br>v.<br><br>MARIO ALVERIO DOMÍNGUEZ, IVONNE M. GARCÍA, SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR MARIO ALVERIO E IVONNE M GARCÍA Y OTROS<br><br>Demandados-Peticionarios | KLAN202400220<br>KLAN202400221 | Apelación -*se acogen como Certiorari*- procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso núm.: SJ2020CV06103 (603)<br><br>Sobre: Incumplimiento de Contrato, Cobro de Dinero-Ordinario, Daños |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio, el Juez Marrero Guerrero y la Jueza Boria Vizcarrondo.

Sánchez Ramos, juez ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 16 de mayo de 2024.

El Tribunal de Primera Instancia ("TPI"), por la vía sumaria, declaró con lugar una solicitud de los herederos de un accionista, dirigida a que se obligara a una corporación, y a su otro accionista principal, a comprar, a determinado precio, su participación en las acciones de la corporación. Según se explica en detalle a continuación, concluimos que erró el TPI, pues las actuaciones, posteriores al acuerdo, de los accionistas iniciales, en conjunto con la precaria situación económica de las empresas concernidas, a la luz del propio texto del acuerdo, resultaron en la extinción e inexigibilidad de lo previamente acordado en cuanto a la fórmula para determinar el referido precio de compra.

I.

En noviembre de 2020, los integrantes de la sucesión de Don Marcelo E. Villena Lanzi (el "Causante"), entiéndase, Sa. Marrathima Trigueiro Rocha, Sr. Enrique C. Villena Draper, Sr. Alfonso Villena Febres, Sa. Patricia Villena Febres y Sa. María A. Villena Trigueiro (los "Demandantes"), presentaron la acción de referencia, sobre incumplimiento de contrato, cobro de dinero y daños (la "Demanda"). La Demanda se dirigió, en lo pertinente, en contra del Sr. Mario Alverio Domínguez (el "Socio"), la Sa. Ivonne M. García, la sociedad legal de gananciales por ambos compuesta y Marmar Auto Detailing, Inc. (la "Corporación").

Se alegó que el Causante y el Socio "fueron socios co-accionistas y/o co-dueños de varias corporaciones y compañías, a saber: [la Corporación], Good For You Franchise, Inc., Good for You, Inc., Wax Point, LLC, Wax Point Franchising, LLC, y PR Fleet Wash Services, LLC" (en conjunto, las "Empresas").

Los Demandantes explicaron que, el 2 de agosto de 2018, el Causante y el Socio (los "Socios") suscribieron un *Acuerdo de Compra y Venta* (el "Acuerdo"). Sostuvieron que el propósito del mismo era "dejar pactado", para cuando uno de los Socios falleciera, "la manera en que debía ... realizarse ... la compra y/o traspaso de acciones y participaciones en las [Empresas] ... entre el socio sobreviviente y los herederos del socio que falleciera ...".

Según el Acuerdo, los Socios habrían obtenido unas "pólizas de seguro de vida", cuyo beneficiario sería la Corporación, y con cuyo producto se financiarían las obligaciones del Acuerdo. Específicamente, se dispuso que "los herederos del Accionista fallecido vendrán obligados a venderle al Accionista sobreviviente, y el Accionista sobreviviente vendrá obligado a comprarle a los herederos del Accionista fallecido, todas las Acciones propiedad del Accionista fallecido al momento de su muerte, por el Precio de

Compra y bajo los términos establecidos en este Acuerdo" (la "Obligación de Vender al Precio Acordado").

El Acuerdo dispuso que el "Precio de Compra" sería "igual al Beneficio de Muerte agregado de las pólizas del Accionista fallecido menos 50% de la Deuda a Liquidarse". Por su parte, "Deuda a Liquidarse" sería el "principal e intereses adeudados al momento del fallecimiento", relacionados con un número de deudas específicamente mencionadas en el Acuerdo, más "el 50% de cualquier responsabilidad financiera relacionada a cualquier sentencia monetaria que advenga final y firme (causada por eventos previos a la muerte de cualquiera de los Accionistas) contra cualquier Compañía que esté en operaciones o contra los Accionistas en su carácter personal."

Según el Acuerdo, ante la muerte de uno de los Socios, el "Beneficio de Muerte" se utilizaría para cancelar el balance de la "Deuda a Liquidarse". Luego, a cambio de entregar su interés sobre las acciones heredadas, los herederos del socio fallecido recibirían del socio sobreviviente "el Beneficio de Muerte sobrante luego de pagar la Deuda a Liquidarse", más un pagaré por la mitad de la "Deuda a Liquidarse".

Para ejecutar el Acuerdo, el Causante inicialmente obtuvo dos pólizas de seguro, una con un beneficio de $2 millones (la "Póliza Mayor") y otra con un beneficio de $1.2 millones (la "Póliza Menor"), ambas con la Corporación como beneficiaria. No obstante, posteriormente, el Causante cambió el beneficiario de la Póliza Mayor al "Fideicomiso de Marcelo E. Villena Lanzi". Por tanto, en cuanto a estas dos pólizas, la Corporación quedó como beneficiaria únicamente de la Póliza Menor (con beneficio de $1.2 millones).

El 6 de diciembre de 2019, el Causante falleció. Los Demandantes alegan que el Socio no ha cumplido con su obligación bajo el Acuerdo de comprarle las acciones que heredaron del

Causante, al precio allí pactado. Además, alegan que el Socio utilizó el producto de la Póliza Menor ($1.2 millones) para pagar deudas no contempladas en el *Acuerdo*. Solicitaron el cumplimiento específico del *Acuerdo*, resarcimiento por daños y perjuicios, remedios en equidad, y gastos y honorarios de abogado.

La Corporación contestó la Demanda; explicó que se dedica a la administración y manejo de las otras compañías adquiridas por el Causante y el Socio. Por otro lado, afirmó que, al no haber sido parte del Acuerdo, no tenía obligación alguna bajo el mismo, ni respondía por las actuaciones, promesas o contratación entre el Causante y el Socio.

Por su parte, al contestar la Demanda, y presentar una reconvención, el Socio alegó (i) que, aunque, luego del Acuerdo, los Socios acordaron que, en adelante, el Causante pagaría la Póliza Mayor y se cambiaría su beneficiario, solo lo último había ocurrido, pues la Corporación se mantuvo pagándola; (ii) que, aunque, luego del Acuerdo, los Socios acordaron que se cancelaría la póliza mayor del Socio, ello no ocurrió.

Por tanto, el Socio planteó que, a raíz de lo anterior, de haber él fallecido primero, el beneficio de muerte que habría recibido la Corporación hubiese sido de $3.2 millones de dólares, mientras que, si fallecía primero el Causante, el beneficio a la Corporación sería de solo $1.2 millones (como en efecto ocurrió). Es decir, arguyó que, como resultado de estos hechos posteriores al Acuerdo, la situación resultó "dispar, distinta y contraria al acuerdo y compromiso de los accionistas". El Socio alegó que lo anterior constituía "dolo" de parte del Causante.

Además, el Socio señaló que, a raíz del fallecimiento del Causante, advino en conocimiento que las Empresas adeudaban aproximadamente $500,000 a varias entidades gubernamentales, locales y federales, así como una cantidad similar, adicional, al

Banco Popular, y que nada de lo anterior se había contemplado en el Acuerdo. Asimismo, alegó que, a la muerte del Causante, advino en conocimiento de otras deudas de las Empresas, no contempladas en el Acuerdo, con suplidores, representantes legales y empleados.

El Socio planteó que el *Acuerdo* no facultaba al Causante a cambiar el beneficiario de cualquiera de las pólizas si el pago continuaba realizándose con dinero perteneciente a las Empresas. Por lo tanto, reiteró que el Causante incumplió con el *Acuerdo* al mantener a la Corporación pagando la Póliza Mayor, mientras cambió el beneficiario de la misma dos meses antes de fallecer.

El Socio arguyó que, de conformidad con el inciso 9 del *Acuerdo*, en caso de que se cambiaran los beneficiarios porque las Empresas no pudiesen continuar sufragando las pólizas, o se cancelase alguna por falta de pago, quedaban sin efecto los incisos 3, 5, 6, y 7 del *Acuerdo.* Estos son los relacionados con la Obligación de Vender al Precio Acordado, es decir, con la transferencia de acciones en caso de muerte, la cancelación de la Deuda a Liquidarse, y los términos de la compra de acciones por los herederos del accionista que falleciera. El Socio solicitó que se le pagase a la Corporación el producto de la Póliza Mayor, en vista de que la misma se continuó pagando con dinero de dicha entidad, más daños y perjuicios.

Por su parte, la Corporación también reconvino. Alegó que, antes de fallecer, el Causante estaba a cargo de la parte administrativa de las Empresas. Añadió que, ante la precaria situación económica que las compañías presentaban desde el 2019, los Socios acordaron cancelar el pago de algunas de las pólizas de seguro y asumir el pago de otras. No obstante, a pesar de que se eliminó a la Corporación como beneficiario de la Póliza Mayor, el Causante permitió que la misma se continuara pagando con dinero de la Corporación, contrario a lo acordado. Ello, unido a las

cuantiosas deudas de la Corporación, no contempladas en el *Acuerdo*, causó, según la Corporación, que se cumplieran las condiciones de la cláusula nueve (9) del *Acuerdo*.

Los Demandantes replicaron que era falso que el Socio conociera de las deudas no contempladas en el Acuerdo solo luego del fallecimiento del Causante, pues desde año y medio antes, el Socio estaba a cargo de la administración y contabilidad de las Empresas. Reiteraron que el Socio incumplió con el Acuerdo al utilizar el producto de la Póliza Menor para satisfacer deudas no contempladas en el *Acuerdo*. Negaron que se activara la cláusula nueve del *Acuerdo.*

Al cabo de varios trámites procesales, el 1 de septiembre de 2023, los Demandantes presentaron una *Solicitud de Sentencia Sumaria Parcial* (la "Moción"). Explicaron que el *Acuerdo* constituyó un "buy-sell agreement" en el cual específicamente se detallaron las deudas que debían pagarse con el beneficio de muerte y se estableció que el sobrante debía pagársele a los Demandantes a cambio de su interés en las acciones de las Empresas. Afirmaron que, no obstante haber recibido el beneficio de la Póliza Menor, el mismo se utilizó para pagar deudas que no estaban contempladas en el *Acuerdo*. En vista de lo anterior, los Demandantes indicaron que el récord le permitía al TPI concluir que la Corporación y el Socio habían incumplido el *Acuerdo*.

La Corporación se opuso a la Moción; en esencia, reiteró que había sido el Causante quien incumplió el *Acuerdo*. Ello porque este removió a la Corporación como beneficiaria de la Póliza Mayor, pero dejó que el pago de la prima se continuara debitando de la cuenta de la Corporación, contrario a lo acordado entre los Socios. Es decir, el Causante no asumió el pago de la prima de la Póliza Mayor, condición indispensable si se pretendía cambiar el beneficiario. Arguyó que dicho incumplimiento perjudicó a las Empresas y activó

la cláusula novena del *Acuerdo*. Por ende, sostuvo que los Demandantes no pueden exigir el cumplimiento específico del *Acuerdo* en lo relacionado con la compra de sus acciones.

De forma similar, el Socio se opuso a la Moción; planteó que, ante la insolvencia de las Empresas, procedía la activación de la cláusula nueve (9) del *Acuerdo*. Además, se hizo eco de lo planteado por la Corporación en cuanto al incumplimiento del Causante al cambiar el beneficiario de la Póliza Mayor sin asumir el pago de la prima, dejándola a cargo de la Corporación.

Los Demandantes replicaron; alegaron que la decisión de reemplazar a la Corporación como beneficiario de la Póliza Mayor fue una decisión informada y discutida entre los Socios. Reiteraron que el *Acuerdo* constituyó un "buy-sell agreement" y que las pólizas fueron destinadas para este propósito, no para financiar la actividad comercial de las Empresas. Insistieron en que el beneficio de muerte no se utilizó de conformidad con el *Acuerdo*. Arguyeron que no procedía aplicar la cláusula nueve (9) del *Acuerdo* porque su aplicabilidad está condicionada a que no existieran pólizas para sufragar el *Acuerdo* y debido a que los Socios no manifestaron la intención expresa de activar dicha cláusula.

Mediante una *Sentencia Parcial* notificada el 22 de diciembre (el "Dictamen"), el TPI concluyó que el Socio no había cumplido con sus "obligaciones bajo el Acuerdo al utilizar el Beneficio de Muerte para pagar deudas no contempladas" en el mismo. Por tanto, declaró "ha lugar" la Moción. El TPI determinó que no había controversia sobre los siguientes "hechos":

1. Entre los años 2007 y 2019, Villena-Lanzi y Alverio-Domínguez mantuvieron una relación de negocios en cuya virtud figuraron como únicos accionistas y miembros de las siguientes entidades con fines de lucro y creadas al amparo de las leyes del Estado Libre Asociado: Marmar Auto Detailing, Inc. (Marmar), Good For You Franchise, Inc., Good For

You, Inc. Wax Point, LLC, Wax Point Franchising, LLC y Puerto Rico Fleet Wash Services, LLC.[1]

2. Entre el año 2012 y el año 2015, Villena-Lanzi y Alverio- Domínguez contrataron dos seguros de vida para cada uno mediante su agente Marsh Saldaña, para un total de cuatro pólizas. Las cubiertas contratadas para cada uno totalizaban $3.2 millones, a razón de una por $1.2 millones y otra por $2 millones para cada cual. Las primas de dichas pólizas eran pagadas por las corporaciones y durante un tiempo estas figuraban como beneficiarias.

3. Las pólizas de seguro de vida son cuatro, expedidas por The Lincoln Life Insurance Company, a saber:

   a. Póliza número T700013455, con Villena-Lanzi como asegurado con beneficio de muerte de $2,000,000.00.

   b. Póliza número T700107553, con Villena-Lanzi como asegurado con beneficio de muerte de $1,200,000.00.

   c. Póliza número T700107554, con Alverio-Domínguez como asegurado, con beneficio de muerte de $2,000,000.00.

   d. Póliza número T700087333, con Alverio-Domínguez como asegurado, con beneficio de muerte de $1,200,000.00.

4. La idea o propósito de las referidas pólizas de seguro de vida era, que ante un fallecimiento o algún evento que ocasione que falte uno de los socios, surgiese un dinero para hacer un "allocation" en "ownership", y no meterse en problema de quién es dueño de qué cuando haya muerte.

5. En el año 2018, Villena-Lanzi y Trigueiro-Rocha se trasladaron al estado de la Florida.

6. El 21 de junio de 2018, Villena-Lanzi otorgó testamento abierto, según surge en la Escritura Número 33 de la obra del licenciado Michell Manuel Feliciano Rodríguez.

7. A mediados de 2018, Marsh Saldaña le propuso a Villena-Lanzi y Alverio Domínguez preparar y firmar un Acuerdo de Compra y Venta (Acuerdo) para establecer una sucesión ordenada de las compañías en el evento de la muerte de cualquiera de los accionistas y "definir realmente [...] los acuerdos que [Villena-Lanzi y Alverio-Domínguez tenían] [...] y estar claros cada quien en lo que podía ocurrir si uno de los dos faltaba". A esos fines, Marsh Saldaña los refirió con Ferraouli, LLC.

---

[1] Se omiten las notas al calce en las determinaciones de hechos del dictamen original.

8. A principios de agosto de 2018, Villena-Lanzi y Alverio-Domínguez suscribieron el Acuerdo, bajo juramento. Villena-Lanzi lo firmó el 2 de agosto de 2018 y Alverio-Domínguez el 3 de agosto de 2018.

9. La redacción del Acuerdo se hizo con la participación de Villena-Lanzi y Alverio-Domínguez, a través de conversaciones y reuniones.

10. El Acuerdo se refiere a Villena-Lanzi y Alverio-Domínguez en el colectivo como los "Accionistas" e individualmente como un "Accionista".

11. El inciso (B) de la primera página del Acuerdo estableció:

> Con el fin de promover la administración y una sucesión ordenada de las Compañías en el evento de la muerte de cualquiera de los Accionistas, los Accionistas desean establecer ciertos derechos y obligaciones respecto la transferencia del interés propietario de los Accionistas en las Compañías (colectivamente las "Acciones") en el evento de la muerte de cualquiera de los Accionistas, bajo los términos y condiciones establecidos en adelante.

12. Entre sus "Definiciones", el Acuerdo dispuso que el término "Beneficio de Muerte" se refiere a "cualquier cantidad pagadera a un beneficiario bajo las Pólizas, según las mismas sean extendidas, modificadas o sustituidas en el futuro".

13. Entre sus "Definiciones", el Acuerdo dispuso que el término "Deuda a Liquidarse" se refiere a lo siguiente:

> [E]l monto principal e intereses adeudados al momento del fallecimiento de cualquiera de los Accionistas relacionado al Préstamo de Marcelo, al Préstamo de Mario, los Prestamos Vigentes y el 50% de cualquier responsabilidad financiera relacionada a cualquier sentencia monetaria que advenga final y firme (causada por eventos previos a la muerte de cualquiera de los Accionistas) contra cualquier Compañía que este en operación o contra los Accionistas en su carácter personal. Para asegurar contra cualquier contingencia de esta índole se retendrá el Precio de Compra la cantidad de $150,000.00 por el término de un año y transcurrido dicho periodo dicho monto, neto de cualquier desembolso para cubrir sentencias monetarias, se desembolsará a los herederos del Accionista fallecido, no obstante, estos últimos serán responsables hasta el monto del Precio de Compra por el 50% de cualquier reclamación comprendida en este párrafo que surja luego del desembolso de los fondos retenidos.

14. Entre sus "Definiciones", el Acuerdo dispuso que el término "Préstamos de Marcelo" se refiere a

"ciertas líneas de crédito rotativas con un interés al 7.5% anual y con un principal original de $291,164.80 extendidas a las Compañías por [Villena-Lanzi] y Alpaquer, L.L.C."

15.    Entre sus "Definiciones", el Acuerdo dispuso que el término "Préstamo de Mario" se refiere a "la línea de crédito rotativa con un interés al 11.75% anual y con un principal original de $80,000.00 extendida a las Compañías por el Maximus Management, Corp."

16.    Entre sus "Definiciones", el Acuerdo dispuso que el término "Prestamos Vigentes" se refiere a:

[E]l préstamo #0001 con Banco Popular de Puerto Rico en la suma principal original de $967,500.00, con un interés al 5.50% anual y vencedero el 3 de octubre del 2021, el préstamo #0001 con Banco Popular de Puerto Rico en la suma principal original de $229,600.00, con interés a la taza prima más 2.25% y vencedero el 1 de noviembre de 2020; y cualquier otro financiamiento en que incurran los accionistas por mutuo acuerdo relacionado a las Compañías.

17.    Con posterioridad a la fecha del Acuerdo, el 2 de agosto de 2018, Alverio-Domínguez y Villena-Lanzi no obtuvieron "financiamiento nuevo", "préstamo", o "línea de crédito" nueva.

18.    Entre sus "Definiciones", el Acuerdo dispuso que el "Precio de Compra" será "igual al Beneficio de Muerto agregado de las pólizas del Accionista fallecido menos 50% de la Deuda a Liquidarse".

19.    El inciso 3 del Acuerdo dispone:

Transferencia por Razón de Muerte de un Accionista. Ante la muerte de cualquier Accionista, los herederos del Accionista fallecido vendrán obligados a venderle al Accionista sobreviviente, y el Accionista sobreviviente vendrá obligado a comprarle a los herederos del Accionista fallecido, todas las Acciones propiedad del Accionista fallecido al momento de su muerte, por el Precio de Compra y bajo los términos establecidos en este Acuerdo.

20.    El inciso 5 del Acuerdo dispone:

*Cancelación de la Deuda a Liquidarse.* Ante la muerte de cualquier Accionista, el Beneficio de Muerte se utilizará, dentro de los primeros treinta (30) días a partir del desembolso del Beneficio de Muerte, en primera instancia para cancelar el balance de la Deuda a Liquidarse. Luego de realizar el saldo de la Deuda a Liquidarse, el Accionista sobreviviente emitirá un pagaré, sustancialmente la misma forma y sustancia a el pagaré aquí incluido como Anejo A (el "Pagaré"), a los herederos del Accionista fallecido por una cantidad igual al 50% del monto de la Deuda a Liquidarse.  Además, se establece que el 50% del

producto neto recibido de cualquier disposición de un activo de capital poseído por el Accionista sobreviviente será aplicado al balance adeudado del Pagaré hasta que sea repagado en su totalidad.

21. El inciso 7 del Acuerdo dispone: Términos de la Compra. Los términos de compra para cualquier compra de Acciones bajo las Secciones 3 o 4 de este Acuerdo serán los siguientes:

(a) La fecha de cierre para dicha transacción (la "Fecha de Cierre") será: (i) en caso de fallecimiento de un Accionista, aquella fecha acordada mutuamente por los Accionista sobreviviente y el albacea u representante designado por los herederos del Accionista fallecido, pero en ningún caso la Fecha de Cierre será posterior al sexagésimo (60mo) día a partir del día en que se desembolse a las compañías el Beneficio de Muerte.

(b) En la Fecha de Cierre, los herederos del Accionista fallecido transferirán asignarán y entregarán a el Accionista sobreviviente título sobre las Acciones del Accionista fallecido libre de toda carga y gravamen, y simultáneamente el Accionista sobreviviente deberán entregar a los vendedores el Beneficio de Muerte sobrante luego de pagar la Deuda a Liquidarse y el Pagaré cuyo valor agregado será igual al Precio de Compra.

(c) A la Fecha de Cierre cualquier beneficio marginal del Accionista fallecido o sus personas relacionadas tales como seguros médicos, reembolso de gastos, beneficios corporativos y otros tipos de beneficios de esta índole terminarán y se cancelarán.

22. El Acuerdo incluyó como "ANEJO A" un modelo del Pagaré indicado en el inciso 7(b).

23. El inciso 9 del Acuerdo provee:

*Insolvencia de las Compañías.* En la eventualidad de que las Compañías, como grupo, no sean capaces de sufragar el pago de primas de las pólizas y este en riesgo de cancelación, los Accionistas tendrán el derecho, pero no la obligación de continuar pagando su correspondiente Póliza, transferirse la titularidad de la misma y designar los beneficiarios que este desee. En la eventualidad de que el derecho estipulado en esta sección se ejerza o cualquiera de las pólizas sea cancelada por falta de pago, las obligaciones bajo las cláusulas 3, 5, 6 y 7 quedarán canceladas y sustituidas por las siguientes provisiones:

*En la eventualidad de la muerte de un Accionista bajo la eventualidad que no existan Pólizas para sufragar este Acuerdo el Accionista sobreviviente tendrá las siguientes dos alternativas:*
   *a) Adquirir las Compañías a cambio de la liberación de los herederos de toda obligación de*

*las Compañías, ya sea por negociación con los acreedores o por cancelación de la deuda; o*
*b) Disolver las Compañías.*
*Los herederos del Accionista fallecido se allanarán a la determinación del Accionista sobreviviente y tomarán cualquier acción y firmarán cualquier documento público o privado necesario para cumplir la voluntad del Accionista sobreviviente.*

24. El inciso 14 del Acuerdo dispone: Honorarios de abogados. En el caso de que cualquiera de las partes presente cualquier acción para hacer cumplir las disposiciones de este Acuerdo, ya sea por ley, en equidad o de otro modo, y prevalezca en dicha acción, tendrá derecho, además a cualquier otro derecho o recurso disponible para dicha parte, cobrar a la otra parte los costos y gastos razonables incurridos en la investigación que precede a dicha acción y el enjuiciamiento de dicha acción, incluidos, entre otros, los honorarios razonables de abogados.

25. El inciso 17 del Acuerdo dispone: "Acuerdo Completo. Este Acuerdo, junto con sus anejos, contiene el acuerdo completo entre las partes relacionado a las transacciones aquí dispuestas y se considerará una novación extintiva de cualquier otro acuerdo, comunicación o entendimiento previo relacionado a la materia de este acuerdo".

26. En el año 2019, Villena-Lanzi y Alverio-Domínguez acordaron hacer cambios en cuanto a los contratos de seguros de vida. Producto de dicho acuerdo Alverio-Domínguez asumiría el pago de la prima de su póliza con cubierta por $1.2 millones designando como beneficiario a la entidad Marmar, y acordaron hacer las gestiones correspondientes para cancelar la póliza de $2 millones, relacionada con Alverio-Domínguez.

27. Respecto a Villena-Lanzi, las partes acordaron que éste asumiría el pago de la prima de la póliza con cubierta de $2 millones, y que podría designar nuevos(s) beneficiario(s) según su predilección.

28. Villena-Lanzi y Alverio-Domínguez acordaron, además, que Marmar continuaría pagando la prima de la póliza con cubierta de $1.2 millones relacionada con el Villena-Lanzi, y Marmar sería la beneficiaria.

29. Villena-Lanzi y Alverio-Domínguez posteriormente discutieron y acordaron cambiar la póliza de vida de Villena-Lanzi a los efectos de que sería este último quien la pagaría y, en vez de Marmar, el beneficiario sería el "trust" de Villena-Lanzi.

30. Del 30 de julio de 2019 al 1 de agosto de 2019, Villena-Lanzi estuvo admitido en el Cleveland Clinic, Florida, Weston Hospital 4C.

31. El 7 de octubre de 2019, Villena-Lanzi designó al fideicomiso "Restatement of the Marcelo Villena Revocable Living Trust, Dated January 5, 2012, as Amended on July 21, 2016" como beneficiario de su póliza de vida con cubierta de $2 millones (Póliza número T700013455).

32. La designación del fideicomiso "Restatement of the Marcelo Villena Revocable Living Trust, Dated January 5, 2012, as Amended on July 21, 2016" como beneficiario de la póliza con cubierta de $2 millones (Póliza número T700013455), fue una decisión informada y discutida entre el Villena-Lanzi y Alverio-Domínguez.

33. Desde el 22 de octubre de 2019 al 24 de octubre de 2019, Villena-Lanzi estuvo en observación en el Cleveland Clinic, Weston Hospital–Observation, con citas médicas de seguimiento para el 25 y 28 de octubre y estudio a realizarse el 1 de noviembre de 2019.

34. El 21 de noviembre de 2019, Villena-Lanzi fue admitido al ICU del Mayo Clinic Hospital en Jacksonville, Florida.

35. El 6 de diciembre de 2019, Villena-Lanzi fue puesto en hospicio y tratamiento paliativo.

36. El 6 de diciembre de 2019, Villena-Lanzi falleció, sobreviviéndole su viuda, un (1) hijo mayor de edad, un (1) hijo menor de edad y dos (2) hijas menores de edad. El causante murió testado en Jacksonville (Duval County), en el Estado de Florida, EE. UU.

37. Según designado como beneficiario, la aseguradora pagó el beneficio de muerte de $2 millones de la Póliza número T700013455 al "Restatement of the Marcelo Villena Revocable Living Trust, Dated January 5, 2012, as Amended on July 21, 2016".

38. Según designado como beneficiaria, la aseguradora pagó el beneficio de muerte de $1.2 millones de la Póliza número T700107553 a Marmar.

39. El "Beneficio de Muerte" de $1.2 millones de la Póliza número T700107553, fue recibido por Alverio-Domínguez, a nombre de Marmar, en diciembre de 2019.

40. En enero de 2020, Alverio-Domínguez se reunió por primera vez con Trigueiro-Rocha. Para esta fecha, Alverio-Domínguez ya había recibido y depositado el cheque de beneficio de muerte de la póliza de $1.2 millones.

41. Con el beneficio del seguro de vida de $1.2 millones, Alverio-Domínguez pagó $1.2 millones en deudas que este entendió correspondían a las compañías.

42.   El 3 de febrero de 2020, el tribunal emitió las cartas testamentarias en el caso civil núm. SJ2020CV00284, tramitadas por Trigueiro-Rocha.

43.   Las Cartas Testamentarias acreditaron a Trigueiro-Rocha como albacea testamentario de Villena-Lanzi.

44.   Trigueiro-Rocha solicitó y obtuvo del Departamento de Hacienda de Puerto Rico el correspondiente relevo de gravamen sobre caudal relicto.

45.   Cuando Alverio-Domínguez mencionó "prioridades de la compañía" en su deposición, se refirió a que hizo un inventario de deudas y estableció las "Prioridades que tiene la compañía para pagar deudas" y lo hizo con el propósito de "evitar demandas a los herederos y a mi persona. Porque son posibles demandas y posibles situaciones.  Lo que estamos haciendo es minimizando el daño".

46.   Alverio-Domínguez admitió que las deudas eran solamente de las Compañías al "cien por ciento".

47.   Alverio-Domínguez no consultó con la Sucn. Villena-Lanzi previo a utilizar el "Beneficio de Muerte" de $1.2 millones para pagar las deudas.

48.   Luego de la muerte de Villena-Lanzi, Alverio-Domínguez nunca preparó ni entregó a la Sucn. Villena-Lanzi "el Pagaré cuyo valor agregado será igual al Precio de Compra" indicado en el inciso 7(b) del Acuerdo.

49.   Luego de la muerte de Villena-Lanzi, Alverio-Domínguez nunca entregó a la Sucn. Villena-Lanzi el "Precio de Compra".

50.   De la "Deuda a Liquidarse", relacionada a financiamientos, líneas de crédito o préstamos, definida en el Acuerdo, (Definiciones(b)), el Alverio-Domínguez indicó lo siguiente bajo juramento:

a. Sobre el "Préstamo de Marcelo", explicó que Villena-Lanzi le indicó que se trataba de una línea de crédito que utilizaba, pero Alverio-Domínguez nunca vio documentación de esa línea de crédito y tampoco tenía conocimiento del banco, o lo que ocurrió con ella. A pesar de que no tenía conocimiento directo, Alverio-Domínguez no objetó a la inclusión de la misma en el Acuerdo porque su relación con Villena-Lanzi era de "mucha confianza".

b. El préstamo #0001, con el Banco Popular de Puerto Rico, era uno de los "Préstamos Vigentes" especificados en el Acuerdo como "Deuda a Liquidarse", con valor expresado de $967,500.00, pero que fue saldado en su totalidad con el dinero

del "Beneficio de Muerte" de la póliza de $1.2 millones, mediante un pago de $541,161.81.

c. El otro préstamo #0001, con el Banco Popular de Puerto Rico, era uno de los "Préstamos Vigentes" especificados en el Acuerdo como "Deuda a Liquidarse", con valor expresado de $229,600.00, pero que fue saldado en su totalidad con el dinero del "Beneficio de Muerte" de la póliza de $1.2 millones, mediante un pago de $88,314.18.

d. Alverio-Domínguez, incluyó como "Préstamos Vigentes", según definidos en el Acuerdo una línea de crédito con el BPPR, que estaba atada a los otros "Préstamos Vigentes" (#0001) del Banco Popular y que adeudaba $25,515.99; esta fue saldada en su totalidad con un pago por la suma de $25,515.99, realizado con el dinero del "Beneficio de Muerte" de la póliza de $1.2 millones.

e. Alverio-Domínguez, también incluyó entre los "Préstamos Vigentes", una deuda de tarjeta de crédito de GFY a nombre de Villena-Lanzi, cuya deuda fue saldada en su totalidad con el dinero del "Beneficio de Muerte" de la póliza de $1.2 millones, mediante un pago de $28,760.83.

f. Alverio-Domínguez, también incluyó entre los "Préstamos Vigentes", una deuda tarjeta de crédito de Good For You, Inc. a su nombre, cuya deuda fue saldada con el dinero del "Beneficio de Muerte" de la póliza de $1.2 millones, mediante un pago de $5,346.62.

g. El Sr. Alverio Domínguez, también incluyó entre los "Préstamos Vigentes", una deuda de préstamo de vehículo de motor de uno de los negocios, cuya deuda fue saldada en su totalidad con el dinero del "Beneficio de Muerte" de la póliza de $1.2 millones, mediante un pago de $12,944.28.

51. Al saldar los tres "Préstamos Vigentes" con Banco Popular (préstamos #0001 y línea de crédito), el referido banco liberó "garantías personales" de Alverio-Domínguez y Villena-Lanzi.

52. Alrededor de febrero de 2020, Alverio-Domínguez preparó una lista detallada de las deudas pagadas con el "Beneficio de Muerte" de la póliza de $1.2 millones. Según la lista, el total de los pagos emitidos ascendieron a $1,140,157.10. El balance restante fue de $59,842.90.52.

53. La lista detalla los siguientes acreedores: Departamento de Hacienda (pagos ascendientes a un total de $147,906.75), Internal Revenue Service (pagos ascendientes a un total de $110,846.28), Municipio de San Juan ($5,800.36), CRIM ($29,979.19), Departamento de Trabajo (pagos ascendientes a un total de $34,595.77), Fondo del Seguro del Estado (pago total de $44,084.99), Banco

Popular (pagos ascendientes a un total de $701,043.71), transacción legal Mirellys ($18,824.46), transacción legal USIC/TOTAL ($10,000.00), Karelys Marcano-Mercadeo ($5,850.00), Patricia Jiménez-Mercadeo ($1,750.00), International Printing ($3,212.68), Lcdo. Rafael Sánchez ($7,868.75), Oficial Legal Ferraiuoli ($4,358.13), Rivera Giménez Estudio Legal ($4,720.00), Baerga Quintana Law Office ($9,905.23), LMM Food ($1,600.00), Full Circle Communications ($4,700.80).

54. Alverio-Domínguez indicó que al presente hace transferencias de dinero entre las Compañías y las clasifica como préstamos.

55. En diciembre de 2023, Alverio-Domínguez, en representación de Good For You Franchise, Inc., suscribió el Asset Purchase Agreement con José E. Vázquez Barquet, en representación de Andremar Co., Inc.

56. Mediante el Asset Purchase Agreement, Good For You Franchise, Inc. le vendió a Andremar Co., Inc. los derechos de franquicia dentro del territorio de Puerto Rico sobre Red Mango.

57. El 19 de diciembre de 2019, José E. Vázquez Barquet le remitió a Good For You Franchise, Inc. el cheque oficial núm. 103103500025540 del Banco Popular por la cantidad de $60,000.00.

58. Para la fecha en que Good For You Franchise, Inc. vendió los derechos de franquicia de Red Mango del territorio de Puerto Rico por la cantidad de $60,000.00, dicha empresa había sido notificada como disuelta en el Registro de Corporaciones.

59. De acuerdo a la deposición de Alverio-Domínguez, fue Villena-Lanzi quien acordó con José E. Vázquez Barquet venderle los derechos de franquicia de Red Mango.

60. Dicha compraventa fue culminada por Alverio-Domínguez posterior a la muerte de Villena-Lanzi sin la participación de la Sucn. Villena-Lanzi.

El TPI razonó que el Acuerdo era válido y susceptible de cumplirse, pues no acontecieron las condiciones específicas que impedían la distribución del beneficio de muerte de conformidad con el mismo.

El 8 de enero (lunes), tanto la Corporación, como el Socio, solicitaron la reconsideración del Dictamen. Mediante una

Resolución notificada el 5 de febrero, el TPI denegó las referidas mociones de reconsideración.

Inconformes, el 6 de marzo, el Socio y la Corporación presentaron los recursos que nos ocupan. En su recurso (KLAN202400220), la Corporación señala que el TPI cometió los siguientes dos (2) errores:

> 1. Erró el Tribunal al decidir en favor de la parte demandante-apelada mediante el mecanismo de sentencia sumaria.

> 2. Erró el Tribunal al no determinar los hechos esenciales y pertinentes sobre los que hay controversia sustancial en contravención con la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4.

Por su parte, en su escrito (KLAN202400221), el Socio formula los siguientes señalamientos de error:

> 1. Erró el Tribunal de Instancia al emitir sentencia sumaria parcial a favor de la parte demandante interpretando un contrato sin atenerse al sentido literal del mismo o en la alternativa sin permitir la celebración de una vista para evaluar la intención de las partes que suscribieron el mismo.

> 2. Erró el Tribunal al emitir una sentencia sumaria parcial sin consignar en la misma hechos esenciales y pertinentes sobre los que hay controversia entre las partes en contravención con la Regla 36.4 de Procedimiento Civil.

Consolidados ambos recursos, y con el beneficio de la comparecencia de los Demandantes, resolvemos.[2]

---

[2] Por el Dictamen no constituir una sentencia y, por tanto, no ser apelable, acogemos los recursos como peticiones de *certiorari*. Mediante el Dictamen, el TPI anunció su apreciación definitiva sobre una de las reclamaciones de los Demandantes. No obstante, dicha reclamación no fue resuelta de forma final, pues no se dispuso ningún remedio; es decir, no se ordenó a los demandados a realizar acto alguno, ni se les condenó a pagar cuantía alguna. Adviértase que "[u]na sentencia es cualquier determinación que el Tribunal de Primera Instancia emita, la cual finiquite la cuestión litigiosa y de la que se pueda apelar". Regla 42.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 42.1. Para que lo dispuesto por el TPI constituyese una "sentencia", era necesario que lo único que faltase fuera ejecutarla. *García v. Padró*, 165 DPR 324, 332 (2005). Por su parte, hemos determinado expedir el auto de *certiorari*, pues, por la naturaleza medular de lo resuelto por el TPI, están presentes las circunstancias que justifican nuestra intervención en esta etapa. Véanse Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R.40; Regla 52.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1; *800 Ponce de León Corp. v. AIG*, 205 DPR 163, 186 (2020) (la Regla 52.1, *supra*, no impide expedir el auto de *certiorari* cuando el dictamen interlocutorio "puede[] afectar sustancialmente el resultado de un pleito" o "limit[ar] sustancialmente [una] reclamación").

II.

La sentencia sumaria es un mecanismo procesal que se utiliza para lograr la solución justa, rápida y económica de una controversia donde resulta innecesario celebrar un juicio en su fondo. *Meléndez González v. M. Cuebas, Inc.,* 193 DPR 100, 109 (2015). Este mecanismo procede cuando no existe una controversia real sobre hechos materiales. Un hecho es material cuando puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010). La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3, llama a estos hechos *esenciales y pertinentes*.

La Regla 36, *supra*, impone un número de requisitos tanto al proponente de la sentencia sumaria como al que se opone a la misma. La moción de sentencia sumaria debe contener: una exposición breve de las alegaciones de las partes, los asuntos litigiosos en controversia, la causa de acción sobre la cual se solicita la sentencia sumaria, una relación concisa y organizada en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia, con indicación de los párrafos o páginas de la prueba documental donde se establecen los mismos, la argumentación del derecho aplicable y el remedio que se solicita. 32 LPRA Ap. V, R. 36.3(a).

De igual forma, el que se opone a la sentencia sumaria tiene que cumplir con las exigencias de la Regla 36. En particular, debe enumerar aquellos hechos materiales de buena fe controvertidos y aquellos sobre los cuales no hay controversia. En ambos casos, por cada hecho, se tiene que indicar los párrafos o páginas de la prueba documental que establecen o impugnan ese hecho. 32 LPRA Ap. V, R. 36.3(b).

La parte que se opone a que se dicte sentencia sumariamente "no podrá descansar solamente en las aseveraciones o negaciones

contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica, como lo haya hecho la parte promovente". 32 LPRA Ap. V, R. 36.3(c). Los hechos enumerados en la moción de sentencia sumaria que no sean debidamente controvertidos podrán considerarse admitidos. 32 LPRA Ap. V, R. 36.3(d). De forma similar, "[e]l tribunal no tendrá la obligación de considerar aquellos hechos que no han sido específicamente enumerados". *Íd.*

El tribunal podrá dictar sentencia sumariamente cuando, de las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas y otra evidencia, no surja controversia real sustancial sobre algún hecho material y, además, proceda como cuestión de derecho. 32 LPRA Ap. V, R. 36.3(e).

Por su parte, la Regla 36.4 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4 y su jurisprudencia interpretativa, disponen que los jueces del foro primario están obligados, cuando deniegan, parcial o totalmente una moción de sentencia sumaria, a hacer una determinación de los hechos que han quedado incontrovertidos y aquellos que aún están en controversia. El carácter mandatorio de la determinación de los hechos materiales sobre los cuales no existe controversia sustancial y sobre cuales sí, tiene el propósito de propiciar una revisión adecuada por los foros apelativos. *Meléndez González et al.*, 193 DPR a la pág. 113, citando a J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, 2da. ed., San Juan, Pubs. JTS, 2011, T. III, págs. 1074-1075.

III.

En nuestro ordenamiento jurídico, las obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga culpa o negligencia. Artículo 1042 del

Código Civil de 1930, 31 LPRA sec. 2992.[3]  Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes y deben cumplirse a tenor con los mismos. Artículo 1044 del Código Civil, 31 LPRA sec. 2994.  Los contratos existen desde que una o varias personas consienten en obligarse con otro a dar alguna cosa o prestar algún servicio.  Artículo 1206 del Código Civil, 31 LPRA sec. 3371.

Una obligación contractual se configura cuando concurren los siguientes requisitos: (1) consentimiento de los contratantes; (2) objeto cierto que sea materia del contrato; y (3) causa de la obligación.  Artículo 1213 del Código Civil, 31 LPRA sec. 3391.  Al concurrir lo anterior, se perfecciona el contrato y, desde entonces, dicho contrato obliga al cumplimiento de lo expresamente pactado y a todas las consecuencias que según su naturaleza sean conformes a la buena fe, el uso y la ley.  Artículo 1210 del Código Civil, 31 LPRA sec. 3375.

La buena fe no sólo se manifiesta al comienzo del contrato, sino que está presente mientras dure la relación contractual.  Se refiere a que las partes adopten un comportamiento leal en toda fase previa a la constitución de tales relaciones y deben también comportarse lealmente en el desenvolvimiento de las relaciones jurídicas constituidas entre ellos.  *BPPR v. Sucn. Talavera*, 174 DPR 686, 695 (2008).  Este principio impone un arquetipo de conducta social que implica la carga de una lealtad recíproca de conducta valorable y exigible.  *Prods. Tommy Muñiz v. COPAN*, 113 DPR 517, 528 (1982).

Claro está, a tenor con el principio imperante de libertad de contratación, los contratantes pueden establecer los pactos,

---

[3] Hacemos referencia al derogado Código Civil de 1930 debido a que sus disposiciones eran las que se encontraban vigentes al momento de suscribirse el *Acuerdo* que originó la controversia entre las partes.

cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público. Artículo 1207 del Código Civil, 31 LPRA sec. 3372. Sin embargo, dicha autonomía se limita en tanto no se deja al arbitrio de uno de los contratantes la validez y el cumplimiento de los contratos. Artículo 1208 del Código Civil, 31 LPRA sec. 3373.

Por otro lado, las obligaciones pueden extinguirse o pueden modificarse. Artículos 1110 y 1157 del Código Civil de 1930, 31 LPRA secs. 3151 y 3241. Entre las formas de modificar o novar las obligaciones, se encuentran las siguientes: 1) variación de su objeto o sus condiciones principales; 2) sustitución de la persona del deudor; o 3) subrogación de un tercero en los derechos del acreedor. Artículo 1157, 31 LPRA sec. 3241. Por su parte, las obligaciones se extinguen: 1. por el pago o cumplimiento; 2. por la pérdida de la cosa debida; 3. por la condonación de la deuda; 4. por la confusión de los derechos de acreedor y deudor; 5. por la compensación; y 6. por la novación. Art. 1110 del Código civil, 31 LPRA sec. 3151.

Destacamos que la novación se define como "la sustitución o cambio de una obligación por otra posterior, que modifica o extingue la primera, ya variando su objeto o condiciones principales, o bien sustituyendo la persona del deudor, o subrogando a un tercero en los derechos del acreedor". VIII J. Manresa y Navarro, *Comentarios al Código Civil Español*, págs. 855-856 (1967). La figura de la novación incluye tanto la modalidad que tiene efectos extintivos de la obligación original, como la novación modificativa en virtud de la cual subsiste una obligación, pero alterada. *P.D.C.M. Assoc. v. Najul Bez,* 174 DPR 716, 725 (2008); *Mun. San Juan v. Prof. Research,* 171 DPR 219, 244; *United Surety v. Villa,* 161 DPR 618, 631 (2004); *Miranda Soto v. Mena Eró,* 109 DPR 473, 478 (1980). Para que la novación tenga un efecto extintivo es necesario que así se declare terminantemente o que ambas obligaciones sean "de todo punto

incompatibles". *Mun. San Juan, supra*, citando el Artículo 1158 del Código Civil, 31 LPRA sec. 3242.

El "deslinde entre la novación modificativa y la extintiva debe realizarse tomando en consideración la voluntad de las partes y la significación económica de la modificación". *Mun. San Juan, supra* (citando a J. Santos Briz y otros, *Tratado de Derecho Civil*, Barcelona, Ed. Bosch, 2003, T. IV pág. 149). Ante la ausencia de la voluntad de extinguir una obligación por otra, "se habrá creado una nueva obligación, pero no se habrá extinguido la primitiva". *Mun. San Juan, supra*, citando a D. Espín Cánovas, *Manual de Derecho Civil Español*, 6ta ed., Madrid, Ed. Rev. Der. Privado, 1983, Vol. III, Cap. II, pág. 153.

Al examinar la figura de la novación, es importante examinar el *animus novandi* o la voluntad de las partes al momento de alterar una obligación. *González v. Sucn. Cruz*, 163 DPR 449, 459 (2004); *Warner Lambert Co. v. Tribunal Superior*, 101 DPR 378, 389 (1973). Ahora bien, en nuestra jurisdicción se presume la voluntad de novar cuando existe total incompatibilidad entre dos obligaciones. *Mun. San Juan, supra*, citando al Artículo 1158 del Código Civil de 1930, 31 LPRA sec. 3242; Santos Briz, *op. cit.*, pág. 150. Esa incompatibilidad conlleva la extinción de la obligación primitiva y el nacimiento de otra en su lugar. *Mun. San Juan*, 171 DPR a las págs. 244-245.

Por último, resaltamos que las obligaciones se modifican variando su objeto o sus condiciones principales, sustituyendo al deudor o subrogando a un tercero en los derechos del acreedor. Artículo 1157 del Código Civil de 1930, 31 LPRA sec. 3241. En el caso de la novación objetiva, esta puede ocurrir "cuando las partes cambian el objeto, la causa o las condiciones principales de una obligación". *Mun. San Juan*, 171 DPR a la pag. 245.

IV.

Sobre la base de los hechos incontrovertidos que surgen del Dictamen, y del récord, concluimos que quedó sin efecto la Obligación de Vender al Precio Acordado, es decir, la obligación del Socio de comprarle a los Demandantes, bajo los términos del Acuerdo, las acciones que heredaron del Causante. Por tanto, erró el TPI al concluir lo contrario. Veamos.

Las actuaciones de, y entendidos entre, los Socios luego de suscrito el Acuerdo, según los propios términos del Acuerdo, dejaron sin efecto las disposiciones del mismo en torno a la Obligación de Vender al Precio Acordado. Según el inciso 9 del Acuerdo, la Obligación de Vender al Precio Acordado quedaría sin efecto si la Corporación no tuviese los fondos para continuar pagando las cuatro pólizas gestionadas por los Socios y, en consecuencia, se acordara que una o más de las mismas se pagarían con fondos ajenos a las Empresas, para beneficio de quien el nuevo titular determinase.

Esto fue lo que ocurrió en este caso. No hay controversia sobre el hecho de que los Socios determinaron que las Empresas no podrían continuar sufragando las cuatro pólizas. Por ello acordaron que (i) la Póliza Mayor la sufragaría el Causante, y la misma tendría un nuevo beneficiario, ajeno a las Empresas; (ii) la póliza mayor obtenida por el Socio se cancelaría; (iii) la póliza menor obtenida por el Socio se continuaría sufragando por este. Puesto de otra forma, la Corporación ya no sufragaría tres de las cuatro pólizas contempladas en el Acuerdo, y solo recibiría el beneficio de una de ellas (la menor), cuando falleciera uno de los Socios.

Nuestra conclusión se fortalece al considerar las cuantiosas deudas de las Empresas que el Acuerdo ni siquiera contemplaba. Ello abona a la conclusión de que, por la menguada (o inexistente)

solvencia de las Empresas, al momento de la muerte del Causante, se activó el inciso 9 del Acuerdo.

Aun en ausencia de lo dispuesto en el inciso 9 del Acuerdo, de todas formas, habría desaparecido la Obligación de Vender al Precio Acordado. Adviértase que el Acuerdo claramente presupone que el producto del Beneficio de Muerte sería suficiente para pagar ciertas deudas contempladas por el Acuerdo, dejando un sobrante para que el socio sobreviviente comprase a los herederos del socio fallecido las acciones heredadas.

No obstante, al tomar en consideración el monto no satisfecho de las sentencias finales y firmes por las cuales alguna de las Empresas responde (que son deudas contempladas por el Acuerdo), el referido sobrante, para todo fin práctico, desaparece.[4] Contrario a lo planteado por los Demandantes, no tiene pertinencia si las Empresas han sido objeto de gestiones activas de cobro al respecto. Ello porque el Acuerdo no sujeta la consideración de dichas sentencias a condición alguna relacionada con la existencia o ausencia de gestiones activas de cobro.

En fin, ante la precaria solvencia de las Empresas, sobre lo cual el récord no deja espacio para controversia alguna, los propios Socios acordaron cancelar aproximadamente dos terceras partes del Beneficio de Muerte que recibiría la Corporación. Esta determinación resultó radicalmente incompatible con la Obligación

---

[4] La suma de la deuda que las partes reconocen tenía que pagarse del Beneficio de Muerte, más la mitad (50%) de las sentencias finales y firmes contra las Empresas, revela un resultado que casi alcanza el referido beneficio; en efecto, el "sobrante" sería de aproximadamente $66,827. Ello sin tomar en cuenta el préstamo del Causante, pues el récord carece de información suficiente al respecto, y sin tomar en cuenta las costas, rentas acumulativas, penalidades, gastos, y honorarios adicionales por la ejecución de las sentencias. Tomamos conocimiento judicial de las siguientes sentencias finales y firmes: *Sentencia Nunc Pro Tunc*, (*Caparra Center v. Wax Point*, SJ2018CV05769); *Sentencia*, (*Caparra Hills v. Good for You*, GB2018CV00679): Sentencia, (*Saavedra Gutiérrez v. Caribbean Fleet Wash Services*, SJ2019CV01433); Sentencia (*Urban Edge Caguas LP H/N/C Vornado v. Good for You*, CG2019CV00743); *Final Default Judgement* (*Crest Foods v. Good for You*, GB2023CV00631) (*Exequatur*). Resaltamos que este "sobrante" aproximado es incluso menor a los $150,000.00 que, según el *Acuerdo,* era la cuantía que debía **retenerse** del precio de compra de las acciones por el término de un año para "asegurar contra cualquier contingencia de esta índole".

de Vender al Precio Acordado, pues privó a las Empresas de su capacidad para sufragar la referida obligación.

Por supuesto, nada de lo anterior implica que los Demandantes no tengan algún otro derecho por virtud de su tenencia de las acciones heredadas del Causante. El propio Acuerdo, en su inciso 9, dispone un mecanismo alterno para que los Demandantes dispongan de dichas acciones y, si el mismo no fuese viable, lo aquí decidido es sin perjuicio de los otros derechos que, por su calidad de accionistas, puedan tener los Demandantes.

V.

Por los fundamentos que anteceden, se expide el auto de *certiorari* y se revoca la *Sentencia Parcial* recurrida. Se devuelve el caso al TPI para la continuación de los procedimientos de forma compatible con lo aquí resuelto y expuesto.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones